867 A.2d 499

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, v. F.M., DEFENDANT–APPEL-LANT, IN THE MATTER OF THE GUARDIANSHIP OF R.M. AND E.M., MINORS.

Superior Court of New Jersey
Appellate Division

Submitted February 7, 2005—Decided February 22, 2005.

236

238

Before Judges CUFF, WEISSBARD and HOENS.

*Yvonne Smith Segars,* Public Defender, attorney for appellant F.M. (*Christine B. Mowry,* Designated Counsel, on the brief).

*Peter C. Harvey,* Attorney General, attorney for respondent (*Andrea M. Silkowitz,* Assistant Attorney General, of counsel and on the brief).

*Yvonne Smith Segars,* Public Defender, Law Guardian, attorney for respondents R.M. and E.M. minor child-respondents (*James A. Louis,* Deputy Public Defender, of counsel; *Cynthia McCulloch DiLeo,* Designated Counsel and on the brief).

The opinion of the court was delivered by

HOENS, J.A.D.

In this guardianship matter, defendant Florence M.[1] appeals from the entry of a judgment terminating her parental rights[2] and placing her two children in the care and under the guardianship of plaintiff Division of Youth and Family Services (DYFS). We reverse and remand.

Because of the grounds on which we base our reversal, we recite the facts and the procedural history of this matter at length. On December 13, 2001, Phillipsburg Police Officer Scott Imboden went to the apartment where Florence and Charles M. resided with their two children Ralph M., then aged twenty-eight months, and Elizabeth M. who was eight months old. His purpose was entirely unrelated to any issue involving Florence or Charles. Instead he was there to assist a detective from the Prosecutor's Office in arresting K.H., a friend of Charles's, on an outstanding warrant.

---

[1] Florence M. is a fictitious name. We refer in this opinion to the parties, F.M., C.M., R.M. and E.M. as Florence, Charles, Ralph and Elizabeth respectively for ease of reference.

[2] Florence's husband Charles did not appear at the guardianship trial and has not appealed the termination of his parental rights to these children.

The apartment was on the second and third floors of a house on Bennett Street in Phillipsburg. While the officers were standing in the doorway on the first floor, Imboden recognized K.H. and arrested him. After making the arrest, K.H. informed Imboden that Charles was not home and he gave Imboden permission to enter the apartment. The officers went upstairs into the parties' apartment and searched the living room, kitchen, bedrooms and bathroom on the second floor as well as the room on the third floor. The reason for that search is not apparent from the record.

It is undisputed that Florence was at work when the search was conducted. Charles had left the children in the care of Carlos, a young adult, while he went shopping. When the police entered, Carlos was in the living room with Ralph, who was wearing only a diaper. There was a brown bag with vomit leaking through it on the floor a few feet from where Ralph was sitting and the room was littered with overflowing ashtrays and empty beer cans. Imboden then found Elizabeth in a crib in her bedroom. Next to the crib was a couch on which there were dirty diapers, empty beer cans, and cigarette butts. In addition, there was a mattress on the floor and clothes were strewn about the room.

According to Imboden's investigation report, the "kitchen had food and debris scattered about, there were numerous trash containers filled with empty beer cans, [and] food was scattered about the tops of both the countertops and the stove." There were also dirty dishes stacked in the sink with food residue on them. Imboden also observed that there "was very little or no edible food" inside the refrigerator and he did not see any baby formula or food for a small child in the kitchen. Imboden then went to the third floor of the apartment, where he found three people sleeping on the floor and another asleep in a bed. Imboden also found that there were numerous cases of beer on the third floor.

Imboden noticed that Ralph had red marks over much of his body, which Carlos thought might be flea bites from the family dogs. When Imboden advised his supervisor of his observations,

the supervisor contacted DYFS and the zoning inspector. The zoning inspector arrived promptly and determined that the premises were fit to live in. As the zoning inspector was leaving, Charles returned home. Imboden informed Charles that the children would need to be taken to the hospital because of Ralph's rash and the condition of the house. Charles consented and the emergency squad transported both children to the hospital.

At the hospital, the doctor initially diagnosed the red marks on Ralph as scabies and concluded that Ralph must have suffered from that condition for several months. In addition, he noted that the tip of Ralph's penis was red, possibly due to "very poor" hygiene and his feet were also blackened by dirt. According to the doctor, Elizabeth had a diaper rash and showed signs of poor hygiene. Hospital workers bathed both children and treated them for scabies. Other doctors confirmed Ralph's diagnosis of scabies two days later and prescribed medication to treat it.

Florence, who at the time was nineteen years old, arrived at the hospital after her work shift ended. By that time, the children had been bathed. She told Imboden that the house was messy because Charles had hosted a party the night before, that she had stayed on the second floor with her children while the party was in progress on the third floor, and that she had told Charles to clean up the mess when she left for work that morning. She was not aware that Charles had not done so or that he had left Carlos in charge of the children. Respecting the children's health, she told Imboden that she had not taken Ralph to a "certified doctor" for approximately six months.

While medical records revealed that Ralph's last visit with a doctor was in July 2001, Florence did not tell the officer or DYFS that the children had been seen at the home by a public health nurse who reported on September 17, 2001 that she had found nothing wrong with them. Florence told DYFS caseworker Sharon Walsh that she thought the red marks on Ralph were the result of flea bites, that she had not sought medical attention because the condition "wasn't that bad" and that she had planned to take him

to the doctor on her next day off, a few days later. At trial, she disputed Imboden's assertion that she had no food for the children. She testified that there was baby formula in the house because she got a month's supply at a time through the WIC program and would "leave it in the bag and put it in the bottom of the closet, in the bottom of the right pantry." She specifically recalled that she had last gotten a supply on the first or second day of December.

After Walsh informed Florence that it was not safe to return the children to her care because of the condition of her home and Ralph's untreated scabies, Florence consented to having her children placed outside the home for fifteen days. Florence immediately asked Walsh what she needed to do in order to have her children returned to her. Walsh told her that the residence needed to be cleaned. When Walsh testified at trial, she conceded that she visited the residence the next day and found that it had been cleaned and was in a condition she found to be acceptable. Based on the consent, however, DYFS had already placed Ralph and Elizabeth in foster care.

On January 9, 2002, DYFS filed its complaint and was granted temporary custody of Ralph and Elizabeth. On the same day, the Family Part judge issued an Order to Show Cause and to Appoint a Law Guardian with Temporary Custody. The order stated that "the removal of the children was required due to imminent danger to the children's life, safety or health" as "both parents failed to have children treated for various medical conditions, notwithstanding they were advised to do so by treating pediatricians."

Florence requested that DYFS place the children with her parents, F.T. and S.T., but the children could not be immediately placed there because DYFS had an open case involving the maternal grandparents. DYFS later ruled out Florence's parents as a potential placement because Florence's mother, S.T., had once tested positive for marijuana and declined to comply with a recommendation that she attend early intervention services. DYFS also considered the children's maternal great aunt, E.V., as

a possible placement. DYFS decided not to place Ralph and Elizabeth with E.V. because of her husband's history of domestic violence arrests and heavy drinking. No other family members were considered as placement alternatives.

On February 22, 2002, Daniel Bromberg, Ph.D., conducted a risk assessment of Florence and Charles "to assess their parenting ability, their ability to provide their children with a safe living environment, and their ability to protect their children from harm." Florence maintained during the evaluation that her family was not in need of any services except "money management, maybe." Dr. Bromberg believed that neither parent had any insight into why DYFS removed their children or the actions they needed to take to regain custody. His report included six recommendations of items to be addressed before either parent could regain custody of these children.

Dr. Bromberg's recommendations may be summarized as follows:

(1) Florence and Charles should consistently attend scheduled visits with their children for at least 12 consecutive weeks. If they cannot attend a scheduled visit, they should notify the appropriate agency representative by telephone at least 12 hours in advance of the scheduled visit; and

(2) Florence and Charles should attend and satisfactorily complete a parenting class in order to enhance their parenting skills and knowledge of child development; and

(3) Florence and Charles should be in psychotherapy, attend on a weekly basis, and should, in the therapists's opinion, demonstrate progress in parenting knowledge and skills; and

(4) Florence and Charles should undergo random urine screenings for both drugs and alcohol; and

(5) Either Florence or Charles should have full—or part-time employment sufficient to support their children; and

(6) Florence and Charles should have stable housing for a minimum of 6 months. DYFS should ensure that the domicile is neat, clean, child-proofed, and generally suitable for habitation by young children.

On April 25, 2002, DYFS referred both Florence and Charles to Catholic Charities in Phillipsburg for individual and couples counseling. Catholic Charities began trying to contact Florence to schedule her visits two or three months later, in July 2002.

Records produced at trial reveal that from July 2002 through October 2002, Florence's telephone was out of service, she did not return messages, and she otherwise "declined contact." Florence did appear once for therapy, but arrived a half-hour late and was therefore unable to participate in treatment. She did not appear for the rescheduled session. Catholic Charities concluded that Florence had not made "any significant attempt" to participate in therapy and closed the file in December 2002.

At trial, Florence testified that she could not attend therapy because of transportation problems and conflicts with her work schedule. She stated that the only days the therapist was available, Tuesdays and Thursdays, were days she was required to be at work. According to DYFS's records, Florence expressed her interest in receiving therapy at Catholic Charities during a court appearance on December 4, 2002. DYFS referred Florence again to Catholic Charities, but bad weather prevented her from attending. There is no suggestion in the record that DYFS made any other referral or attempted to address Florence's concerns about the conflict between her work schedule and the availability of the therapist. At trial, DYFS caseworker Lori Lupo conceded that Florence had alerted her to the fact that the counselor "wasn't making herself available."

Respecting Dr. Bromberg's recommendation that Florence attend and complete parenting classes, in October 2002, DYFS caseworker Lupo gave Florence a telephone number to call to arrange for parenting classes at the Family Resource Center. At trial, Lupo testified that the next available class would have been in January 2003, but that Florence did not attend.

In January 2003, Florence's case was assigned to the Northern Region Adoption Resource Center (NRARC). Rynell White, Florence's caseworker, testified that it was difficult to provide services for Florence because NRARC and all of its resources are located in Bergen County and Florence was living in Warren County. In her words, because of the distance and the relative lack of resources near where Florence lived and worked, finding

services was "a hassle" and the case was an "ordeal." White testified that she attempted to find parenting classes for Florence in Warren County but that each time she found a suitable class, it was already filled up and that there were no classes with openings available. NRARC then referred Florence to a parenting class given by Catholic Charities in Bridgewater, which is in Somerset County, but Florence could not attend.

Instead, in an effort to comply with this requirement, Florence found, enrolled in and attended several classes provided by Northwest New Jersey Community Action Program (NORWESCAP). NORWESCAP documents demonstrate that she participated in two in-home parenting classes provided by NORWESCAP in the fall of 2003 and that she also participated in the NORWESCAP eight-week long "parent's anger management program." Isle Polonko, a NORWESCAP consultant and the program presenter, described Florence's participation as follows:

> This is to inform you that Florence has been steadfast in her attendance and has worked diligently on the material. She arrives early, actively participates, turns in her work each and every week and often stays late to make additional inquiries as to how to appropriately apply the material to parenting issues. She has attended every session.

In addition, Florence successfully completed a twelve-session Parents of Young Children program provided by NORWESCAP on March 10, 2004. At trial, NRARC caseworker White testified that she was unfamiliar with the content of the NORWESCAP programs and was uncertain whether these classes adequately met DYFS's requirements for parenting classes.

Throughout this time Ralph and Elizabeth remained in foster care. At first, they were placed with foster parents not far from Phillipsburg. In July 2002, however, they were moved to a foster home in Bergen County. DYFS provided visitation through Catholic Charities on a weekly basis throughout 2002 and 2003. At first, it was conducted at a site in Phillipsburg, but after the children were moved to Bergen County, the visitation took place in Hackensack. Florence attended most, but not all, of the visits. Some of the visits were cancelled by DYFS because Florence did

not confirm the visit twenty-four hours in advance. Others were cancelled by Florence due to illness or bad weather.

Significantly, NRARC caseworker White described Florence's visitation compliance as "very" consistent. In addition, Florence provided lunch for the children and, by the time of the hearing, was also providing diapers and snacks as well. White explained that it was suggested to Florence that providing supplies for the children would help her to demonstrate that she could be responsible in caring for them. According to White, the visits with Florence went well and Florence "does a nice job during her visits." Other documents in the record refer to Florence as "attentive and affectionate towards both children" and that she "appropriately supervised them." At the same time, however, the April 12, 2002 report noted that when the visit ended, Ralph "did not appear to have difficulty ending the visit." The July 12, 2002 report commented that Ralph "showed reluctance to physically go to" Florence and Charles.

Shortly after DYFS removed Ralph and Elizabeth from their parents' care, Florence began to experience instability in her housing arrangements. Charles and she were evicted from their apartment. For a time, DYFS had difficulty keeping in contact with them and sent all correspondence to them through Florence's parents. In early 2002, Florence and Charles were living with friends on Irwin Street in Phillipsburg but would not allow the DYFS caseworker to visit there and they did not have a separate telephone through which they could be reached. By April 2002, Florence and Charles had left Irwin Street and Florence gave the DYFS caseworker a post office box as her new address. In June, Florence informed the caseworker that Charles and she were looking for an apartment in Easton, Pennsylvania. Later in 2002, Florence resided in Easton with a friend. At the end of 2002, Florence told her caseworker that her name was on the lease for premises on Lehigh Street in Easton, but refused to provide the caseworker with a copy of the lease. At trial, Florence's mother S.T. testified that Florence had been living with her for a year and

that six months prior to the trial, the family had moved to a larger residence in order to have enough room for Ralph and Elizabeth to join them. While it is unclear precisely when it occurred, it appears that Florence separated from Charles before she moved in with her parents. She decided to separate from Charles because he was abusing drugs and unwilling to stop doing so.

Throughout the time relevant to this matter, Florence, in general, was employed. She worked at a major department store [3] from June 2001 until December 2001. She was then unemployed for the time between December 2001 and April 2002. Beginning in April 2002, however, Florence worked part-time for another major retailer for approximately a year. In addition, she worked about thirty hours a week at a small retail store in Phillipsburg from April 2002 until November 2002, then at a clothing store from November 2002 until February 2003. In the spring of 2003, she worked at a restaurant for one month, at a large shopping mall taking Easter pictures for about two weeks and as a cashier at a gas station for a month. She began working at a local diner in July 2003, where she was still employed at the time of trial. She began making child support payments of $90 per week in April 2002, which was later increased to $110 per week. At the time of trial, however, Florence was approximately $2000 in arrears.

By February 2002, Ralph and Elizabeth had been placed in their first foster home. The foster parents reported that Ralph and Elizabeth needed special medical care. Ralph's rash had continued in spite of the scabies treatment while he was in the foster parents' care. By mid-February 2002, it had been determined that the source of his rash was not scabies but an allergy to lotions, laundry detergent, bath soap, and shampoos. On February 13, 2002, the foster parents informed the caseworker that Ralph needed a prescription lotion and shampoo to control his allergic reactions to over-the-counter soap products. In July 2002,

---

[3] The specific names of the establishments where Florence worked have been withheld to further protect the identity of the parties.

DYFS placed Ralph and Elizabeth with their second foster parents, with whom they remained at the time of trial and who have expressed a desire to adopt the children if they become available for adoption.

DYFS's expert, Santa Gregory, Ph.D., performed a psychological assessment on Florence on July 11, 2003. During the interview portion of the assessment, Florence told Dr. Gregory that she "should have" gotten counseling or psychotherapy when she was with Charles, but that she no longer needed that because she had separated from him. Her plan for reunification with her children was to work a single job, instead of one full-time and one part-time job, because she believed that she then might become eligible for public assistance. Dr. Gregory testified that Florence offered no specifics about where her apartment would be or from whom she would obtain day care for her children.

Dr. Gregory described Florence's explanation of the events that led to the children's removal as a "highly rationalized" account. Dr. Gregory stated in her report that Florence "attributes [Ralph's] rash to laundry detergent although the doctor who examined the children noted that the hygiene of both children was 'incredibly poor.'" Dr. Gregory inferred that Florence lacked insight into her own responsibility for what happened to the children and that this indicated that Florence was not accepting any blame for the circumstances which led to the removal of her children. Dr. Gregory noted that she gave Florence a Child Abuse Potential Inventory to complete and return by mail, but that as of August 1, 2003, Florence had not done so. Florence, however, contended that she did attempt to mail the completed inventory to Dr. Gregory but had been given the wrong address.

Dr. Gregory performed a bonding evaluation between Florence and her children. She observed that both Ralph and Elizabeth greeted their mother warmly and referred to her as "Mommy." Florence tried to divide her time between the two children because they did not play together cooperatively. Elizabeth was not interested in the activities her mother provided for her and

instead interfered with her brother's play. Ralph appeared to Dr. Gregory to be unhappy and irritable and Elizabeth spent much of the visit following the caseworker around the office. Dr. Gregory observed that neither child had difficulty separating from Florence when the visit ended.

Dr. Gregory also performed a bonding evaluation on Ralph, Elizabeth and their foster parents. She noted that both children called the foster parents "Mommy" and "Daddy" and interacted with both of them in an affectionate manner. Dr. Gregory observed that the children appeared to play more cooperatively than they had during the bonding evaluation with Florence. Although Elizabeth again interfered with Ralph's play, the foster parents redirected both children when they misbehaved. Dr. Gregory observed that the foster parents allowed Ralph and Elizabeth to explore the room but intervened when things "got out of hand."

Based on the psychological evaluation of Florence and the two bonding evaluations, Dr. Gregory concluded that removing Ralph and Elizabeth from their foster parents would cause them "extreme emotional trauma which would be difficult to remediate." Removing them from their foster parents, she concluded, "would be extremely ill-advised since [Ralph and Elizabeth] have clearly established a strong emotional bond with [their foster parents]." Dr. Gregory noted that Florence's plans for reunification were "vague and unformulated" and that her living arrangements were, as of July 2003, not yet stable. The foster parents, on the other hand, provided Ralph and Elizabeth with a stable home life and a sense of permanency.

Dr. Gregory also expressed concern that Florence had "avoided becoming involved in ongoing psychotherapy and parenting groups or any form of self-help" since losing her children. Dr. Gregory concluded that Ralph and Elizabeth would be exposed to "a high level of risk of harm" if they were returned to Florence's care because she "does not appear able to provide her children with sufficient stability and seems not to fully appreciate the harm to which she has already exposed them."

In her testimony at trial, Dr. Gregory opined that Elizabeth knew Florence was her mother but did not have a strong physical or emotional bond with her. She opined that Ralph had more of a physical bond with his mother than Elizabeth, but that much of the interaction between the two was negative. Dr. Gregory concluded, however, that Ralph would need psychological intervention whether or not the court terminated Florence's parental rights. She concluded that termination of Florence's parental rights would have a negligible effect on Elizabeth.

Florence's expert, Mark Singer, Ed.D., also performed a psychological evaluation of Florence. During his interview of her, Florence told Dr. Singer that the police took her children because "the house was a mess," but told him that it "wasn't that bad." She attributed Ralph's rashes to an allergic reaction to laundry detergent. Florence blamed Charles as the reason why the children had not been returned to her care and she claimed that DYFS failed to properly coordinate services for her so that she could maintain employment.

Dr. Singer reported that his test data suggested the Florence has experienced significant conflict with interpersonal relationships and that she may be experiencing some degree of anxiety in response to a traumatic event in her past. He testified that these traits would impact on Florence's parenting ability, but suggested that therapy would be an appropriate way to address these personality features. He opined that Florence had taken "significant steps" toward reunification with her children by distancing herself from Charles, accessing the services provided by NORWESCAP, and attending anger management classes.

Dr. Singer also conducted a bonding evaluation between Florence and her children. He observed that all three played cooperatively and that Florence appropriately redirected Elizabeth when she tried to get Dr. Singer's attention. Dr. Singer further observed that Ralph initiated physical and verbal interactions with Florence although Elizabeth did not. Toward the end of the session, Ralph began throwing toys and then pinched Elizabeth.

Florence responded by threatening him with a timeout. When Ralph continued to throw toys, Florence again threatened him with a timeout, but did not follow through.

Dr. Singer concluded that Ralph and his mother had a bond consistent with that between a child his age and an "attachment figure." He noted that Ralph was defiant of his mother and appeared to be angry with her and that Florence had trouble controlling him. As to Elizabeth, Dr. Singer concluded that she did not seek "emotional nurturance" from her mother and was somewhat "emotionally and physically distant" from her. He opined that this might have resulted from Elizabeth being separated from Florence at an early age. Dr. Singer also testified that the State's bonding evaluation of Florence and her children was flawed. He pointed out that the session with Dr. Gregory was not conducted in a private room but in a more public area where other adults passed by and distracted the children. That, he concluded, made the results less valid.

Dr. Singer's conclusions, as summarized in his report, are as follows:

While the data does not lead to a recommendation of reunification at this time, the data does suggest that terminating Florence's parental rights at this time may not be appropriate. Florence has begun to make significant changes in her life which are anticipated to assist her in becoming more effective as a parent. With her husband removed from the equation, the risk to the children would apparently be minimized over time. In addition, severing the bond between Ralph and Florence would likely result in the child regressing behaviorally and emotionally. In Elizabeth's case, based upon her age and level of development, such regression would be expected to be minimal. As the foster parents were not subjects in this evaluation, no further comments may be made regarding the nature of attachment between the children and caregivers.

The prognosis for this case is fair to good. While Florence may have failed to provide adequate care for her children in the past, along with her husband, she appears to have taken significant steps to improve her situation and her ability to function effectively as a parent to Elizabeth and Ralph. In addition, there is no evidence suggesting that Florence has ever physically abused her children or has been drug/alcohol involved. The absence of these factors tends to improve the prognosis of the case. Based upon this, providing Florence with an additional 6 months would be anticipated to permit her to further progress while not creating undue harm to the children. At the end of that time period, treatment reports from all treating professionals should be obtained and this case may be revisited.

Florence also testified at trial. She explained that on the evening of December 12, 2001, there was a party at the apartment she shared with Charles to celebrate a friend's twenty-first birthday. The party had started around 8:00 p.m. but the children went to bed around that time. She stated that prior to the party "there was a little bit of dishes" but that the "house wasn't in very bad shape." Florence testified that she went to bed between 9:00 p.m. and 10:00 p.m. and stayed on the second floor of the apartment with the children. She said that the party took place on the third floor, but she could not account for the condition of either the kitchen or Elizabeth's bedroom, which were both located on the second floor. Florence testified that she woke up at about 8:00 a.m. the next morning and left her apartment for work around 9:15 a.m., at which time Ralph and Elizabeth were still sleeping. She conceded that she did not bathe her children that morning but stated that she had done so the previous morning. She could not explain how Ralph's feet had gotten so dirty in one day.

Florence disputed the police officer's assertion that there was no baby formula in the residence. She insisted that there was formula in the kitchen and that it was in a bag in the bottom of the pantry. She explained that she received her paycheck biweekly and received public assistance from WIC and that she bought baby supplies regularly. At the time of the party she was about to go food shopping, having last purchased infant formula at the beginning of December.

Florence also disputed the scabies diagnosis. She admitted that Ralph had a rash, which she described as "a bunch of little red dots" for several days prior to December 13, 2001. She treated Ralph's rash with an over-the-counter cream and it had not worsened. She stated that she had intended to take Ralph to the doctor on her next day off, but had not scheduled a doctor's appointment for him. Florence also testified that shortly before the rash broke out on Ralph, she had begun using a different laundry detergent because it was less expensive. Florence attrib-

uted the rash to the cheaper detergent but she conceded that the redness and inflammation on Ralph's penis might have been caused by unsanitary conditions.

Finally, Florence testified that she had left Charles after the children's removal because he would not stop using drugs and that she was living with her parents, where she planned to live indefinitely.

Trial in this matter proceeded on January 15 and 17, 2004 and again on February 2, 9, 10 and 17, 2004. Counsel filed written summations by February 27, 2004. After considering the testimony and the evidence, the judge placed her oral opinion on the record on May 25, 2004. She concluded that DYFS had proven by clear and convincing evidence each of the statutory criteria, *see* *N.J.S.A.* 30:4C–15.1(a), and that termination of Florence's parental rights was therefore in the best interests of Ralph and Elizabeth. As to the first factor of the four-prong best interests of the child test, the judge stated in pertinent part:

> Now the factor under reviewing factor number one, is whether the children's safety, health, and development has been or will continue to be endangered by the parental relationship.
>
> This is not a case about parents who keep a messy home and how the child that has a harmless, ordinary rash for a limited period of time. If that were all the case was about, then there would not be a case at all.
>
> This is a case about parents who seem to feel love and have affection for their children as evidenced by the manner they interact with their children at visitation, but they are also oblivious as to how to care for and protect their children, and they are resistant to learn how to care for and keep their children safe.

Specifically, the trial court found that Florence and Charles allowed Ralph to suffer from scabies for several months without medical treatment, that they permitted their children to live in squalor and that they let their children become filthy.

The court also found that neither parent made any effort to regain custody of their children. She determined that neither parent could hold a job sufficient to support their children and both were "elusive" concerning their whereabouts. In the judge's view, Florence's housing situation remained unresolved from the time of the children's removal until trial, a two-year period,

although she noted that Florence testified that she would be staying with her parents indefinitely. The trial judge commented that what had been asked of Florence was "not all that great in the final analysis" and that after completing a parenting course, Florence's "obligation at that point would be simply to maintain a full-time job and provide adequate housing," in addition to meeting with a therapist for forty-five minutes a week.

The court also noted that the psychologists, including Florence's own expert, stated that both parents had failed to provide for the needs of their children and that they were not presently ready to be reunited with the children. In concluding that the first part of the statutory test had been met, the court stated:

> Both parents' lack of making any meaningful effort toward getting their children back shows an indifference toward their children, which indicates that the children would be at risk for harm if they are returned to their parents' care, and the demands of parenting would be full time.

> The defendants do not have the desire, the discipline, or the wherewithal to parent, and therefore to place the children in either or both of their care would endanger the children's safety, health, and development.

As to the second prong of the statutory test, the court commented that her decision on the first part of the test had already demonstrated that both parents were unwilling to eliminate the harm to their children. She then described Dr. Gregory's testimony that Ralph and Elizabeth would suffer "extreme emotional trauma" if separated from their foster parents and that the emotional effects of being separated from Florence would be far less. The court found Dr. Singer's conclusion that Florence should be given six more months of time and therapy unpersuasive because it was based on his erroneous assumption that Florence had already begun a program of rehabilitation in earnest, which the judge found was not the case. Further, the court noted that it was also Dr. Singer's opinion that Florence still might not be ready to parent her children even after she was afforded a six-month extension.

As to the third prong of the test, concerning whether DYFS had made reasonable efforts to provide services to Florence, the court

found that DYFS had offered appropriate services and that the parents failed to comply. The court noted that these services included, in addition to the evaluations, a risk assessment and substance abuse evaluation, counseling, parenting classes, and visitation. The court also found that DYFS had explored alternate placements for the children, but that none was appropriate.

Regarding the fourth prong of the test, that is, whether termination of parental rights would not do more harm than good, the court found that the children would be traumatized far more by removing them from their foster parents' home than if their relationship with their parents was severed. The judge also noted that DYFS caseworkers always observed the children to be happy and well cared for in their foster home. The trial judge, in particular, believed Dr. Gregory's testimony that "the foster parents interacted with the children maturely and appropriately," that "their home is stable and safe and that the children have a loving, close relationship."

In summary, therefore, the trial judge determined that DYFS had established each of the requisite statutory criteria set forth in *N.J.S.A.* 30:4C–15.1(a) by clear and convincing evidence, warranting termination of Florence's parental rights. The trial court's order effectuating its findings and conclusions was signed on May 25, 2004.

On appeal, Florence urges us to reverse the trial court's decision because the evidence on which the judge relied was neither sufficient nor credible and because the judge made findings of fact that are contrary to the evidence in the record or are otherwise unsupported. In the alternative, Florence urges us to reverse the trial court's decision because DYFS failed to make a genuine effort to comply with the Child Placement Bill of Rights, *N.J.S.A.* 9:6B–4. Because we find merit in Florence's assertions concerning the sufficiency of the basis for the trial judge's findings, we reverse and remand on that ground and we decline to reach the alternate statutory argument.

We need only briefly summarize the salient principles of law in this area. The rights of parents to enjoy a relationship with their children is of constitutional dimension. *In re Guardianship of K.H.O.*, 161 *N.J.* 337, 346, 736 *A.*2d 1246 (1999)(citing *Stanley v. Illinois*, 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L. Ed.*2d 551 (1972)); *In re Adoption of Children by G.P.B., Jr.*, 161 *N.J.* 396, 403–04, 736 *A.*2d 1277 (1999); *N.J. Div. of Youth and Family Servs. v. A.W.*, 103 *N.J.* 591, 512 *A.*2d 438 (1986). Parents have a constitutionally protected, fundamental liberty interest in raising their biological children. *See Santosky v. Kramer*, 455 *U.S.* 745, 753, 102 *S.Ct.* 1388, 1394, 71 *L. Ed.*2d 599, 606 (1982). The Federal and State Constitutions protect the inviolability of the family unit. *See Stanley, supra,* 405 *U.S.* at 651, 92 *S. Ct.* at 1213, 31 *L. Ed.*2d at 558–59; *A.W., supra,* 103 *N.J.* at 599, 512 *A.*2d 438.

"The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham v. J.R.*, 442 *U.S.* 584, 602, 99 *S.Ct.* 2493, 2504, 61 *L. Ed.*2d 101, 118 (1979). As is true of so many other legal presumptions, "experience and reality may rebut what the law accepts as a starting point. . . ." *Ibid.*, 99 *S.Ct.* at 2504, 61 *L.Ed.*2d at 119. The incidence of child abuse and neglect cases, however, attests to the fact that some parents may act against the interests of their children. *Ibid.*

Government "is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Id.* at 603, 99 *S.Ct.* at 2504, 61 *L.Ed.*2d at 119 (citing *Wisconsin v. Yoder*, 406 *U.S.* 205, 230, 92 *S.Ct.* 1526, 1540, 32 *L. Ed.*2d 15, 33 (1972)). The State as *parens patriae* may act to protect children from serious physical and emotional harm. This may require a partial or complete severance of the parent-child relationship. However, "[f]ew forms of state action are both so severe and so irreversible." *Santosky, supra,* 455 *U.S.* at 759, 102 *S.Ct.* at 1398, 71 *L. Ed.*2d at 610.

When the child's biological parents resist termination of their parental rights, our function is to decide whether the parent can raise the child without causing harm. *See In re Guardianship of J.C.,* 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992). The cornerstone of our inquiry is not whether the parents are fit, but whether they can become fit to assume the parental role within time to meet the child's needs. *Ibid.* "The analysis ... entails strict standards to protect the statutory and constitutional rights of the natural parents." *Ibid.* The burden rests on the party seeking to terminate parental rights "to demonstrate by clear and convincing evidence" that the risk of "serious and lasting [future] harm to the child" is sufficiently great that it requires severance of parental ties. *Ibid.*

The balance between fundamental parental rights and the State's *parens patriae* responsibility is achieved through the best interests of the child standard. *See K.H.O., supra,* 161 *N.J.* at 347, 736 *A.*2d 1246. Under that standard, now codified by statute, parental rights may be severed when:

(1) The child's safety, health and development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his foster parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[*N.J.S.A.* 30:4C–15.1(a).]

These standards are neither discrete nor separate. They overlap to provide a composite picture of what may be necessary to advance the best interests of the children. *See K.H.O., supra,* 161 *N.J.* at 348, 736 *A.*2d 1246. The considerations involved in determining parental unfitness are " 'extremely fact sensitive' " and require particularized evidence that addresses the

specific circumstances of each case. *Ibid.* (quoting *In re Adoption of Children by L.A.S.*, 134 *N.J.* 127, 139, 631 *A.*2d 928 (1993)).

"Trial Court findings are ordinarily not disturbed unless 'they are so wholly unsupportable as to result in a denial of justice,' and are upheld wherever they are 'supported by adequate, substantial and credible evidence.'" *Meshinsky v. Nichols Yacht Sales, Inc.*, 110 *N.J.* 464, 475, 541 *A.*2d 1063 (1988) (quoting *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974)). When the credibility of witnesses is an important factor, the trial court's conclusions must be given great weight and must be accepted by the appellate court unless clearly lacking in reasonable support. *See In re Guardianship of DMH*, 161 *N.J.* 365, 382, 736 *A.*2d 1261 (1999). "[T]he trial court is better positioned [than we] to evaluate [a] ... witness' credibility, qualifications, and the weight to be accorded her testimony." *Ibid.*

With these principles in mind, we turn to the findings and conclusions of the trial judge. Our review of the record compels us to conclude that as they relate to Florence, those findings and conclusions are not supported by evidence which is clear and convincing. We reach this conclusion for several reasons.

First, the court did not engage in a separate analysis of the facts relating to Florence, but set forth findings about the parents jointly. The result of that mode of analysis is that the findings as to Florence are overshadowed by entirely legitimate concerns about Charles. Viewing the two parents individually, however, the facts about Florence are insufficient to support termination of her parental rights.

Second, some of the salient findings about Florence are completely unfounded. Notably, while we ordinarily defer to factual findings, and particularly to credibility findings, *see Cesare v. Cesare*, 154 *N.J.* 394, 411–12, 713 *A.*2d 390 (1998); *Rova Farms, supra*, 65 *N.J.* at 483–84, 323 *A.*2d 495; this record contains virtually no findings based on credibility and therefore requires

less deference from us than would be otherwise appropriate. More to the point, many of the factual findings are based on matters that, objectively, cannot be sustained.

For example, although the trial judge noted that Ralph suffered from scabies, a condition that had developed over a long time, and that Florence had ignored it, and while the judge apparently found Florence's explanation for the rash to be a baseless denial of guilt, the record fully supports Florence's story and not the findings of the judge. In fact, the scabies diagnosis, so critical to the judge's reasoning, was an incorrect one. The rash continued long after Ralph had been removed from his mother and long after medical treatment had been rendered. Ralph's foster parents reported that the condition was an allergy to soaps and similar products and that they had begun to use prescription cleansers with success. Therefore, Florence's explanation about having switched to a cheaper brand of detergent almost certainly explained the rash. Nor did the evidence in the record support the conclusion that Florence failed to get medical attention for the child for lengthy periods of time. Her statement to the police about not having taken the children to a doctor for months is entirely consistent with records demonstrating that the children were seen more frequently by a public health nurse and were found to be doing well.

Similarly, the judge's finding, in particular her comment about the condition of the home on the day when the children were removed, is largely unsupported. Although the apartment was perhaps in a "deplorable" state when the police arrived, the housing inspector who saw it the same day found it fit for habitation. More to the point, when the DYFS representative told Florence that the home needed to be cleaned as a condition of return of the children, it was cleaned to DYFS's satisfaction by the very next day.

In addition, respecting Dr. Bromberg's six recommendations, Florence complied in whole or in part with virtually all of

them. First, her visits with the children were regular, even after the children were placed in a foster home a great distance away. When asked, she began to provide lunch for the children and to bring other supplies for them. Her caseworker described her as doing a "nice job" during the visits, her interactions with the children were appropriate and the children, by and large, were happy to see her.

Second, she found and attended both parenting and anger management classes and had in-home parenting sessions when DYFS was unable to refer her to appropriate or available services. There is nothing in the record to suggest that these programs were less adequate than similar classes that DYFS could offer, all of which were unavailable and most of which were conducted only a great distance from Florence's home.

Third, although Florence did not participate in individual or couples therapy, the only individual program that DYFS found for her could not accommodate her work schedule and DYFS simply never located an alternate program for Florence. It is hardly fair to place Florence in the position of having to choose between maintaining employment and complying with the recommendation that she have therapy, particularly when the unavailability of a therapist could have been addressed had DYFS made the attempt. As for Florence's conceded failure to attend couples counseling, given that she elected to end her relationship with Charles because of his substance abuse problem as a part of her effort to achieve reunification with her children, she was entirely justified in commenting to Dr. Gregory that she was no longer in need of that type of counseling.

Fourth, the requirement that she participate in random drug screenings and in treatment for substance abuse was, in light of the record, entirely unnecessary. At the time of the removal of these children from her home, there was no evidence that Florence had any substance abuse problem. Nonetheless, Florence did appear for testing and was found to be substance-free. There was, as a result, no need for her to participate in substance abuse

treatment. In reality, this recommendation was directed to Charles, whose substance abuse problem ultimately led Florence to leave him. That being true, Florence's asserted failure to comply is unfounded.

Fifth, although Florence has had difficulty securing a single steady job, her efforts to find and maintain employment were indeed continual. She did, of course, have periods of unemployment and some of her jobs were seasonal and short-lived. By the same token, she often had multiple jobs at once. At the time of the hearing she demonstrated that she had a positive work history overall and she had been working at her restaurant job for seven or eight months.

Sixth, Florence certainly exhibited a lengthy period of housing instability, particularly during the time when she was continuing her relationship with Charles. The record amply supports the conclusion that for much of the time following the removal of her children, she was without a permanent place to live. However, by the time of trial, it is undisputed that she had been living with her parents and that they had found a larger home in order to accommodate Florence and her children.

In light of these facts, the judge's findings reflect the lack of progress that Charles had made and the lack of interest in the children that he had shown. As they relate to Florence, however, the judge's observations are unsupported and her findings are factually erroneous. Particularly critical to our analysis is the judge's assertion that this case is not just about a messy house and a minor rash. In the end, while one might indeed criticize Florence for both of those failings, the suggestion that the case was ever about more than that simply does not withstand scrutiny.

We are not unmindful of the opinions of the experts. We are particularly mindful of the opinion of Florence's own expert, who concluded that she was not yet ready to be reunited with her children. The trial judge discounted his opinion that she might be able to achieve reunification after six more months of therapy on

the ground that he mistakenly believed that she was already working in therapy. In fact, the trial judge overlooked the extensive work that Florence had accomplished in her parenting and anger management classes and blamed her for the failing of DYFS to offer her services that were, as a practical matter, available to her. Although it is true that Florence may need six months of additional therapy before being reunited with her children, that fact did not support terminating her parental rights. As our Supreme Court has cautioned, the fundamental focus of the inquiry is not whether the parent is now fit, but whether the parent can become fit in time to meet the needs of the children. *See J.C., supra,* 129 *N.J.* at 10, 608 *A.*2d 1312.

Nor are we unmindful of the fact that these children undoubtedly have strong bonds with their foster parents, bonds made even stronger by the passage of time from the time of the evaluations, through the trial, through the preparation of the judge's opinion and through this appeal. Indeed, it is largely the strength of those bonds that gives rise to DYFS's plan for foster parent adoption of these children, a plan that is supported on appeal by the Law Guardian.

As to Ralph, DYFS's expert opined that he would need to engage in therapy regardless of whether he was reunited with Florence. As to Elizabeth, while her attachment to Florence was weaker, the continued visits evidenced a bond between the two. Although the bonds these children have developed with their foster parents are strong, those bonds alone are an insufficient basis on which to terminate Florence's parental rights. *See State v. T.C.,* 251 *N.J.Super.* 419, 432–33, 598 *A.*2d 899 (App.Div.1991), *certif. denied,* 146 *N.J.* 564, 683 *A.*2d 1160 (1992).

Plainly, Florence will need to engage in the therapy that DYFS previously failed to afford her and that was an impediment in the view of both experts to reunification. Both Ralph and Elizabeth will also need therapy in order to assist them with reunification with Florence as well as with the inevitable disruption to their lives that leaving their foster parents will entail. We echo,

however, our observation in *T.C.* that "[t]here is much that is disquieting about this case." *Id.* at 433, 598 *A.*2d 899.

We further find instructive the following admonition of this court:

A final separation from a biological parent is a harm in itself.... Experts are increasingly concerned about the seriousness of this loss and are recognizing the need for continued contact with a biological parent, even a flawed parent.... Our courts have recognized that a child's relationship with a parent is of such significance that doubts are to be resolved against its destruction.

[*In Re Guardianship of J.E.D.*, 217 *N.J.Super.* 1, 15–16, 524 *A.*2d 1255 (App.Div. 1987).]

We recognize that DYFS's expert believes that the harm to Ralph and Elizabeth that will flow from their separation from their foster parents will be extreme and that their removal from that placement will be ill-advised. We recognize that Florence will need assistance and support if she is to be reunited with her children. We also recognize that the best interests of the children must be the focus of all future proceedings. We leave to the sound discretion of the trial court how best to serve these competing considerations.

The order terminating Florence's parental rights to Ralph and Elizabeth is reversed and the matter is remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.