# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4097-16T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

 Plaintiff-Respondent,

v.

J.C.,

 Defendant,

and

T.C.,

 Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF Z.F.C.-C.,

 a Minor.

_____

Argued March 4, 2020 – Decided April 27, 2020

Before Judges Whipple, Gooden Brown and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FG-12-0081-16.

Catherine Reid, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Catherine Reid, on the briefs).

Karen Louise Cavalier, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason Wade Rockwell and Melissa H. Raksa, Assistant Attorneys General, of counsel; Valeria Dominguez and Christina Anne Duclos, Deputy Attorneys General, on the briefs).

David Ben Valentin, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; David BenValentin, on the briefs).

PER CURIAM

Defendant father, T.C. (Trent)[1], appeals from a May 12, 2017 judgment of guardianship terminating his parental rights to his son, Z.F.C.-C. (Zack), following a limited remand to the trial court. He also appeals from the remand judge's denial of his motion to vacate the judgment under Rule 4:50-1. We affirm.

---

[1]  Due to the confidential nature of records pertaining to the placement of a child, we use pseudonyms in lieu of actual names. See R. 1:38-3(d)(13).

In June 2014, Zack was born prematurely with chronic lung disease. He was intubated and placed in the neonatal intensive care unit. J.C. (Julia), his mother, was thirteen at the time of his birth and Trent was seventeen.[2]

One month later, Trent and Julia were arrested for robbing a gas station with a knife. Trent has been incarcerated since that arrest. A Division of Child Protection and Permanency (Division) caseworker met with Trent at the juvenile detention center. Trent requested a paternity test and offered his mother, M.C. (Marla), as a family resource placement for the child who, at that time, remained hospitalized. In August 2014, Trent was charged with first-degree robbery, N.J.S.A. 2C:15-1, and third-degree aggravated assault of a sheriff's officer, N.J.S.A. 2C:12-1(b)(5)(h).

On September 23, 2014, the court granted the Division custody, care, and supervision of Zack. Zack remained hospitalized for sixteen months. The court ordered the Division to "continue to explore possible family resources as placement options" and to arrange a paternity test for Trent. The court also found Julia, then housed in a youth shelter, should engage in parenting classes and was entitled to weekly supervised visitation with Zack at the hospital after her release from detention.

---

[2] Julia is not a party to this appeal.

A-4097-16T1

Zack had a feeding tube and was connected to oxygen at all times because he was unable to swallow or breathe on his own. Trent, who remained incarcerated, initially had no visits with Zack, but the court later ordered that Trent was entitled to supervised visitation contingent "upon his release from jail and the test results from the paternity test." Although the permanency goal at the outset of the case was reunification, the Division did not provide Trent with any services while incarcerated and the paternity test was unnecessarily delayed.

The Division ruled out Trent's mother, Marla, as a resource placement because she was previously substantiated for abuse and neglect and "either not willing or not able to provide a home" for Zack. Marla appealed the substantiation to the Department of Children and Families (DCF), and in August 2015 DCF affirmed the rule-out, citing her "vulnerable housing issues."

On September 10, 2015, Trent pled guilty to first-degree robbery. Later that month, the court ordered the Division to "inquire with [Zack's] treating physicians if it would be safe for the child to have visits with [Trent] at the correction[al] facility." However, Zack's illness made it infeasible to transport him from the hospital to Trent's correctional facility. In November 2015,

4

Trent was sentenced to eight years in prison subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

On December 16, 2015, the Division filed a complaint for guardianship of Zack. In February 2016, Zack, who had been released from the hospital in October 2015, began monthly visits with Trent at the correctional facility. On April 29, 2016, at a placement hearing, the Division offered two relatives as possible placement options: Trent's aunt, L.J. (Lily), and A.E. (Aaron), who was then believed to be Julia's father; both expressed a desire to adopt the child. The court placed Zack with Aaron, where he remains. In April 2017, Julia executed an identified surrender of her parental rights with Aaron as the identified adopting parent. In May 2016, Aaron took custody of Zack.

Bonding evaluations were conducted by Richard Singer, Ed.D., of Aaron and Zack who had been living together for nearly five months. In his report, Singer opined Zack engaged in play, was "very verbal . . . both responsively and spontaneously," and he called Aaron "Pop-Pop." According to Singer, Aaron was "very appropriate," provided "very good structure," and Zack "verbally mirrored" Aaron at times, a "sign of connectedness."

On December 6, 2016, the caseworker accompanied Zack, who was now two and a half years old, and Singer for a bonding evaluation with Trent in the

correctional facility. Following that visit, Singer issued a second psychological and bonding evaluation report. Singer concluded Trent had a "personality style consistent with Narcissistic Personality Disorder with dependent and depressive features," which would create "difficulty acknowledging and responding to the needs of others," overreliance on others' "advice and guidance," and "feelings of hopelessness." Singer opined Trent was "likely to have difficulty responding flexibly and effectively to the changing needs of his child" and, therefore, found that Trent was "not likely to become a viable parenting option . . . in the foreseeable future." Regarding bonding, although the child had "developed a level of comfort with his father over time," Zack had "not come to see [Trent] as being a significant parental figure" and was "not likely to experience significant and enduring harm should he lose this relationship."

Just prior to the guardianship trial, Trent's correctional facility verified that he was pursuing his GED and had completed both a parenting and child support program.

The guardianship trial took place between April 18, and April 20, 2017. Singer testified as an expert in bonding, parenting capacity, forensic psychology, risk assessment, child custody, and parenting strategies. He

6

restated the conclusions from his report, adding that he believed Trent "appear[ed] to have an issue regarding the use of alcohol." Singer said that issue "would have to be addressed" upon Trent's release, and, "consistent with the DSM-V[3] standard," he had to show twelve months of sobriety upon release before he could care for Zack.

Singer further testified that, despite his youth, Trent already had a criminal history, which included, in addition to the convictions for which he was presently serving sentences, prior arrests for a drug offense and joyriding.[4] Based on this history, Singer believed Trent "clearly will require time to demonstrate the capacity to create appropriate stability in his own life" upon release before he could create stability for Zack. Singer was also concerned that Trent "engaged in this robbery after his child's birth," which was "suggestive of very poor planning."

At the second bonding evaluation, Trent told Singer he believed it was in Zack's best interests to continue living with Aaron until Trent's release when Trent would then "come home and get [Zack]." Singer concluded that "on

---

[3] Diagnostic and Statistical Manual of Mental Disorders.

[4] The record is unclear whether either arrest led to an adjudication of delinquency.

A-4097-16T1

some level, [Trent] understands that he cannot care for [Zack]," which was why he was attempting to have the child placed with his mother or his aunt. Singer also noted that Trent had not offered Julia as a parenting option, even though "he did indicate that he had planned on parenting with [Julia]."

Although Zack was "slow to warm up" to Trent on both occasions, Singer found nothing "unusual" about that given he had only seen the child a few times in Zack's two-year lifetime. Consistent with his report, Singer described Trent's interactions with Zack as "very appropriate," even in the "sterile" setting of the correctional facility room where the evaluation took place. Trent "was effective in redirecting" Zack and there was an appropriate level of touching and comfort.

However, the child's reactions to Trent were inconsistent with what Singer would have expected between a child and "a significant attachment figure." A child of Zack's age would typically be "excited to see a significant attachment figure" and everyone else in the room would become a "null factor," but Singer observed no similar excitement in Zack. Singer observed that Zack asked Singer, not Trent, for help removing his jacket, which was significant, because if the child viewed Trent as an attachment figure, he

would have asked him for help, rather than Singer. When it was time to leave, Zack "separated easily" from Trent.

Singer concluded that Aaron was Zack's psychological parent and a significant attachment figure. In Singer's view, "attachment development has to do with frequency and intensity of contact[,]" and severing Zack's connection with Aaron would likely cause "significant and enduring harm if that harm cannot be mitigated." The feelings of loss, sadness, and low self-esteem associated with such a severance would likely imperil the child's ability to form meaningful attachments later in life. Singer stressed the importance of the child having a "secure attachment," which is best established when a child looks "to someone else for the kind of stability and security, the kind of control, to create an appropriate physical and emotional environment for a child" and that Aaron presented this option for Zack. If Zack lost his "clearly . . . meaningful relationship" with Aaron he was likely to suffer "significant long-term effects."

Nevertheless, Singer stated that "parenting capacity" was the more "salient feature" than attachment for Zack, and expressed skepticism Trent would be able to mitigate the harm that would befall Zack in the event of a traumatic separation from Aaron. Singer concluded the best result for Zack

9

would be to terminate Trent's parental rights so that the child could obtain permanency through adoption by Aaron.

Singer was the only expert witness to testify. Trent called no witnesses. On May 12, 2017, the court terminated parental rights. Trent appealed.

However, while the appeal was pending, Trent moved for summary disposition or, in the alternative, for a remand. We denied Trent's motion for summary disposition, but ordered a limited remand permitting Trent to move under Rule 4:50-1 for relief from the final order terminating his parental rights to Zack, on the grounds of the newly discovered evidence that Aaron and the child were not actually related, as had previously been believed.

On January 23, 2019, at a case management conference following the remand, Julia's counsel reported that Julia had called and was "extremely upset" and wanted to withdraw her surrender and get her child back. It was unclear to counsel whether Julia was asking counsel for help or whether she was requesting new counsel. The court found it needed to hear testimony from Julia before it would make the decision on Trent's Rule 4:50-1 motion.

10

In February 2019, the court conducted a hearing. Julia was present without counsel.[5] Julia testified that at the time she surrendered her parental rights, she believed Aaron to be her father, but she later learned through DNA testing that he was not her father. Had Julia known the truth at the time, she testified, she would not have surrendered her parental rights, but "would have asked for an alternative." Counsel attempted to ask Julia whether she now wished to withdraw her surrender, the Division objected, and Julia was not permitted to respond. Sustaining the objection, the court held that the question was "off the issue" and "not relevant" to Trent's motion for relief from the judgment under Rule 4:50-1. Specifically, the court found it was not relevant "what [Julia] would have done differently," and it did not matter "whether she would withdraw her surrender if she knew," because she neither appealed, nor requested a withdrawal.

---

[5] Counsel for the Division spoke with Julia off the record and represented, "[i]t's our understanding that . . . nothing changes her position." The court then gave Trent's counsel the opportunity to speak with Julia. When the Division noted that Julia "just filled out a 5A" to obtain legal representation, however, the court responded, "[s]he can't . . . [s]he didn't appeal." The court based this on the Office of Parental Representation's (OPR) position. The court added it "wasn't really thinking" along those lines, but that the OPR "ha[d] to deal with this all the time," and therefore accepted that individuals who "haven't filed a formal appeal," are not entitled to representation on a motion following a remand from that appeal.

11

Trent also called Marla as a witness. She testified the first time she met Aaron, at the placement hearing in April 2016, he purportedly said that he did not actually believe he was Zack's grandfather, but that he would "do anything he can to make sure the baby doesn't go into the system." Marla added that she reported this to her sister, Lily, to her children, and to two Division workers who had taken her for visits with her grandson but whose names she could not recall. She told no one else prior to the remand.

The Law Guardian called Aaron, who denied ever saying to Marla that he did not believe he was Zack's grandfather. He testified that Zack, who was then four years old, had been in Aaron's care for three years, since he was placed in his home in May 2016. Aaron said he first learned Julia was his daughter in 2013 or 2014 from Julia's biological mother. Aaron reached out to Julia and attempted to start a relationship, but "[i]t was a little difficult in the beginning," because she was, at the time, in a correctional facility. Aaron learned about Zack a couple of months later. Aaron said he did not seek custody of Julia, who was, at that time, a minor in the Division's custody, because he "was told" that he could not have custody of both Julia and Zack, and Julia had asked him to concentrate on getting custody of Zack.

A-4097-16T1

Aaron further testified it was only after Julia had surrendered her parental rights to have Zack adopted by Aaron that he learned that was her intention. He had no discussions with her about it beforehand. At some point after the guardianship trial, Julia called Aaron and told him he was not her father, which was "heartbreaking" and "devastating." Although Aaron was "still in shock about the situation" he remained committed to adopting Zack, because, in his view, Julia was still his daughter and Zack was still his grandson. The court found him to be a credible witness.

On March 14, 2019, the court denied Trent's motion in a written decision and order finding no deliberate misrepresentations or fraud had been presented to the court and there was a strong judicial interest in maintaining permanency because Aaron was Zack's psychological parent. Julia and Aaron both testified that at the time of the identified surrender, they both believed Aaron was Julia's biological father. Trent filed an amended notice of appeal, incorporating the motion judge's decision into the appeal. Julia never joined Trent's motion or appealed.

I.

Trent argues, as a threshold matter, that the Division was precluded from filing its guardianship complaint under N.J.S.A. 30:4C-15(c) until it satisfied

the statutory "prerequisites" of exercising "reasonable efforts to reinforce family structure," attempting to "assist the parent in overcoming the conditions that led to the placement of the child," and exploring "alternatives to termination" under N.J.S.A. 30:4C-15.1(a)(3). Trent also claims the Division failed to meet the "prerequisite obligation" to "initiate a search for relatives who may be willing and able to provide the care and support required by the child . . . within [thirty] days" of taking custody. N.J.S.A. 30:4C-12.1(a).

Finally, Trent contends the Division failed to fulfill its "overlapping" statutory obligation under a third statute, the Child Placement Bill of Rights Act, N.J.S.A. 9:6B-1 to -6 (CPBRA), by failing to employ its "best efforts" to place Zack with Marla, following his removal as required by N.J.S.A. 9:6B-4(b). He asserts the Division gave "conflicting information" about why it had ruled out Marla. In his view, the court erred by failing to dismiss the guardianship complaint on jurisdictional grounds since the Division had not fulfilled these statutory prerequisites. We reject these arguments because they misconstrue the statutes at issue.

Ordinarily, we do not entertain "questions or issues not properly presented to the trial court when an opportunity for such a presentation is

available . . . ."  Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). Because Trent's arguments invoke jurisdiction, we address them.  Ibid.

Statutory interpretation typically begins with "'[t]he plain language of the statute . . . .'"  Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 302 (2011) (quoting State v. Hupka, 203 N.J. 222, 231 (2010)).  Courts should apply to the statutory terms the generally accepted meaning of the words used by the Legislature, id. at 302-03, and "read them in context with related provisions so as to give sense to the legislation as a whole," DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citation omitted).  Only "if there is ambiguity in the statutory language that leads to more than one plausible interpretation," or "if the overall statutory scheme is at odds with the plain language," may courts look "to extrinsic evidence, 'including legislative history, committee reports, and contemporaneous construction.'"  Id. at 492-93 (citations omitted).  There is no need to refer to such sources here, because the statute's meaning is clear.

N.J.S.A. 30:4C-15.1 provides, in pertinent part: "The [D]ivision shall initiate a petition to terminate parental rights on the grounds of the 'best interests of the child' pursuant to [N.J.S.A. 30:4C-15(c)] if the following

15

standards are met." (emphasis added). The statute then lists the "best interests" prongs discussed infra, section II. N.J.S.A. 30:4C-15.1(a) (emphasis added).

Under Trent's construction, the Division can "only" initiate a termination petition if the four-prong best-interest standards are met prior to filing the petition, but the word "only" is not in the statute, nor is any temporal component. Ibid. Had the Legislature intended to require the Division to meet all prongs prior to filing a guardianship complaint, as Trent claims, it could have done so by providing that the Division could only initiate a petition after those prongs have been fully satisfied, but no such language was included. Generally, "what 'the Legislature omits the courts will not supply.'" Klink v. Twp. Council of Monroe, 181 N.J. Super. 25, 30 (App. Div. 1981) (citation omitted).

Trent's interpretation is also inconsistent with the discretion that N.J.S.A. 30:4C-15 vests in the Division to file for terminating parental rights "[w]henever . . . it appears that the best interests of any child under the care or custody of the [D]ivision require that he be placed under guardianship." N.J.S.A. 30:4C-15(c) (emphasis added). Sections 15 and 15.1 must be read harmoniously to give meaning to the overall legislative scheme. See In re Return of Weapons to J.W.D., 149 N.J. 108, 115 (1997) (citation omitted)

("Statutes in _pari_ materia are to be construed together when helpful in resolving doubts or uncertainties and the ascertainment of legislative intent.").

Neither did the other statutes strip the court of jurisdiction to conduct the guardianship trial. First, regarding N.J.S.A. 30:4C-12.1(a), even assuming that the Division failed to meet its obligation to search for the child's relatives within thirty days, that failure would not automatically defeat a termination claim. It would simply be a factor for the court to consider when deciding whether the Division had met its burden of providing reasonable efforts under N.J.S.A. 30:4C-15.1(a)(3) to help Trent correct the circumstances that led to Zack's out-of-home placement. See N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013) (reasoning that by failing to conduct a "reasonable investigation" of relative placements under N.J.S.A. 30:4C-12.1(a), the Division bore "the litigation risk that a Family Part judge [would] conclude" under N.J.S.A. 30:4C-15.1(a)(3) that it has failed to prove that "alternatives to termination of parental rights" have been considered.).

Similarly, though the CPBRA requires the Division's "best efforts . . . to place the child with a relative," N.J.S.A. 9:6B-4(b), the Act has been interpreted to pertain to the rights of children to be placed with relatives during that placement period, In re D.C., 203 N.J. 545, 563 (2010), not to a court's

jurisdiction to preside over a guardianship trial brought by the Division. The CPBRA does not reference termination proceedings, nor does it create additional burdens for the Division to meet prior to initiating such proceedings under Title Thirty. N.J.S.A. 9:6B-1 to -6.

Here, the Division could not have placed Zack with a relative from the time when the court first granted it custody in September 2014 until, at the earliest, October 2015, when the child was finally discharged from the hospital for the first time in his life, at sixteen months old. Zack was then placed, within six months of his discharge, with Aaron, a man whom the Division reasonably believed to be a relative based on representations by both Aaron and Julia.

## II.

Having reviewed the record, we also reject Trent's arguments that the Division did not meet its burden as to guardianship and the termination of parental rights.

Under Title Thirty, "[w]henever . . . it appears that the best interests of any child under the care or custody of the [D]ivision require that he be placed under guardianship . . . a petition to terminate the parental rights of the child's parents, setting forth the facts in the case, shall be filed by the [D]ivision . . . ."

N.J.S.A. 30:4C-15(c),(f).  The "best interests" test requires the Division to show that:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm.  Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

"The Division must prove by clear and convincing evidence that all four statutory criteria are satisfied."  N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 554 (2014).  "These elements are not discrete and separate," ibid., but, rather "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests," In re

Guardianship of K.H.O., 161 N.J. 337, 348 (1999); accord N.J. Div. of Youth & Family Servs. v. F.M., 375 N.J. Super. 235, 258 (App. Div. 2005). The test "is fact-sensitive, and evidence used to satisfy one prong can also be used to satisfy another." N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 379 (App. Div. 2018) (citing K.H.O., 161 N.J. at 348). "The cornerstone of [the] inquiry is not whether the parents are fit, but whether they can become fit to assume the parental role within time to meet the child's needs." F.M., 375 N.J. Super. at 258.

When we review orders terminating parental rights, our scope of review is limited. N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 112 (App. Div. 2004). We "will not disturb the factual findings of a trial judge unless 'they are so wholly unsupportable as to result in a denial of justice,' and . . . will uphold such findings whenever they are supported by adequate, substantial and credible evidence." C.S., 367 N.J. at 112. "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility' since the trial court has a different perspective by virtue of seeing and hearing the witnesses." Ibid. (citations omitted). "Reversal is required only in those circumstances in which the trial court's findings were 'so wide of the mark that a mistake must have been made.'" N.J.

Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228, 240 (App. Div. 2010) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)).

Based on our review of the record, we conclude that Judge Michael J. Nelson's factual findings are supported by substantial credible evidence, and that his legal conclusions are sound in light of those findings. See R.G., 217 N.J. at 552. In particular, we agree with the judge's conclusion that the record convincingly demonstrated Trent's incarceration harmed Zack by subjecting him to sustained delay of stability and permanency that would continue to endanger his health and development. He noted the nature of the crime, armed robbery, was also relevant to Trent's parental fitness and potential for rehabilitation. Relying on Singer's testimony, the court found even upon Trent's release from incarceration, Trent would lack the capacity to parent Zack due to his alcohol issues, his criminal record, poor planning and inability to create a stable environment for himself and Zack. Zack lives with Aaron and it was clearly and convincingly proven that it is in his best interests to remain there.

A-4097-16T1

### III.

Finally, in his supplemental brief submitted after the remand, Trent argues the remand judge committed reversible error in utilizing an incorrect standard under <u>Rule</u> 4:50-1. Based on our review of the record, Trent's arguments lack support. The newly discovered evidence of the lack of a biological relationship between Julia and Aaron does not change any of the analysis the court used in application of the best interest test.

Trent's other arguments are unavailing and not supported by credible evidence in the record. His contentions are without sufficient merit to warrant further discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION