# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4185-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

C.E.G. a/k/a G.-L., M.E.P.,
and J.M.E. a/k/a J.E.M.,

     Defendants,

and

S.A.L.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF C.G.P.G.,
D.A.P., A.A.L.G., N.A.L.G.,
D.O.L.G., and J.J.M.G., minors.

_____

Submitted September 20, 2021 – Decided October 14, 2021

Before Judges Messano and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FG-14-0021-20.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Victor E. Ramos, Assistant Deputy Public Defender, of counsel and on the briefs).

Andrew J. Bruck, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Peter D. Alvino, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors A.A.L.G., N.A.L.G. and D.O.L.G. (Maria Emilia Borges, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant S.A.L. (defendant or Sean)[1] appeals from a June 30, 2020 judgment of guardianship terminating his parental rights to his biological sons, A.A.L.G. (Adam), born in January 2013, N.A.L.G. (Noel), born in January 2014, and D.O.L.G. (Duke), born in October 2015, and granting guardianship of the children to the Division of Child Protection and Permanency. The judgment also terminated the parental rights of C.E.G. (Carla) to the boys and their half-

---

[1] We use initials and pseudonyms to protect the confidentiality of the parties and to preserve the confidentiality of these proceedings. R. 1:38-3(d)(12).

brothers, C.G.P.G., (Carlos), born in March 2008, D.A.P. (Damian), born in September 2009, and J.J.M.G. (Joel), born in August 2018, following Carla's voluntary surrender of all six children at the close of evidence in the guardianship trial.[2]  Carla does not appeal from the judgment or otherwise participate in this appeal, but her conduct is relevant to the issues raised by defendant.  He seeks reversal, arguing the Division failed to prove all four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence.  Among other issues, defendant's overlapping arguments challenge the testimony of the State's expert witness.  The Office of Law Guardian joins the Division in supporting the judgment.

Following written submissions of the parties, the trial judge issued an oral decision finding the Division satisfied the four-prong test by clear and convincing evidence and held that termination was in the children's best interests.  In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999).  Based on our review of the record and applicable law, we cannot discern on this record whether the Division satisfied three of the four best interest prongs.

---

[2]  The judgment also terminated the parental rights of M.E.P., the biological father of C.G.P.G., following the guardianship trial; and J.M.E., the biological father of D.A.P. and J.J.M.G., by voluntary surrender.  These fathers and sons are not parties to this appeal.

Accordingly, we affirm in part and reverse and remand in part for proceedings consistent with this opinion.

I.

The guardianship trial spanned eight days between January and March 2020. The Division moved into evidence more than 150 exhibits, and presented the testimony of three caseworkers, and Frank J. Dyer, Ph.D., a licensed psychologist. Elizabeth Stilwell, Psy.D., testified on behalf of Carla as to the psychological evaluation and bonding evaluation she conducted on the maternal grandmother and her six grandchildren. The evidence did not include a bonding evaluation between defendant and his sons; a comprehensive psychological evaluation of defendant; or a substance evaluation of defendant. Defendant did not testify or present any evidence. He was represented by assigned counsel and appeared telephonically from Ecuador.

To place the legal issues in context, we recount, chronologically, the significant facts from the testimony adduced at trial and the voluminous documentary record before the trial court.

Defendant and Carla first became involved with child protective services in Pennsylvania when they lived in Stroudsburg with their son Adam, and Carla's older children, Carlos and Damian. In July 2013, the Monroe County Children

4

and Youth Services (MCCY) opened a case on the family after police entered the home pursuant to a welfare call from Carla's mother. The home was in "deplorable condition." The bathroom was so littered with garbage, it could not be used. Barely any food was present; food on the stove was covered with mold. Police observed no milk or baby formula in the home, except for a soured bottle of formula located in a swing where six-month-old Adam was seated. Noel and Duke had not yet been born. Adam, Carlos, and Damian were placed with Carla's parents until the home was cleaned and made habitable.

Four months later, in November 2013, Carla was incarcerated for drug possession. During her incarceration, she gave birth to Noel.

In August 2014, defendant was arrested for his second driving while intoxicated (DWI) offense, and thereafter incarcerated for seven months. While on probation in September 2015, he was deported[3] to Ecuador. Adam was thirty-two months old, Noel was twenty months old, and Duke was born the following month.

---

[3] We recognize "'[r]emoval' is the current statutory term used for what was known in the past as 'deportation.'" State v. Gaitan, 209 N.J. 339, 345 n.1 (2012) (citing Padilla v. Kentucky, 559 U.S. 356, 364 n.6 (2010)). Nonetheless, we use the term, "deported," to avoid confusion with the children's various "removals" from their parents' care.

In April 2016, following Carla's relapse and inability to care for the children, MCCY removed all five boys[4] from her care. The children remained in foster care until June 2017, when they were reunified with Carla. Thereafter, the family's case with MCCY remained open; defendant remained in Ecuador.

In October 2017, Carla moved to Dover, New Jersey with the children, Damian's father, J.M.E. (Juan), and his two daughters, M.E. (Maya) and K.E. (Karmen). In view of MCCY's ongoing supervision, the Division opened a case on the family. Soon thereafter, the Division received referrals reporting concerns about injuries to Carlos, Maya, and Karmen.

The precipitating event that led to the guardianship complaint occurred on May 24, 2018, when the Division received a referral that Maya arrived at school with multiple bruises on her body. Carla told the responding caseworker that Maya's injuries occurred accidentally. Later that evening, Karmen was hospitalized after Carla found her in the tub hardly breathing. Karmen too, had multiple bruises on her body at different stages of healing. Again, Carla claimed the injuries were accidental. Karmen was diagnosed with a skull fracture and hematomas, caused by two traumatic impacts. To date, Karmen cannot move

---

[4] Joel was not born until August 2018, after the Division was granted custody of his siblings.

her legs and arms. When interviewed by the prosecutor's office, Carla only acknowledged she hit the children "on the hand, thigh, or butt with her hand."[5]

The Division executed a Dodd removal[6] of all five children and was granted custody following a hearing on May 30, 2018. Defendant's sons were placed with a resource family, with whom they continuously resided through the time of the guardianship trial. At the time of the removal, Adam was five years old, Noel was four years old, and Duke was five months shy of his third birthday.

Thereafter, the Division located defendant in Ecuador. On August 22, 2018, pursuant to the Division's request and its contract with International Social Services of Ecuador (ISS), a clinical psychologist and psychotherapist conducted a home study concerning defendant and his extended family, with whom he resided. The following month, ISS issued a favorable report. Among other things, the report indicated defendant had a stable job as a carpenter, and "harmonious" relationships with his divorced parents and extended family on

---

[5] We affirmed the trial judge's findings that Carla physically abused Karmen and Juan abused and neglected the child. N.J. Div. of Youth & Fam. Servs. v. J.M.E. and C.G., No. A-0211-19 (App. Div. Dec. 22, 2020) (slip. op at 16).

[6] A Dodd removal is an emergent removal of a minor without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82, known as the Dodd Act. N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

both sides. Defendant's family supported his desire for reunification with his sons. Their five-bedroom home was large enough to accommodate the boys. Medical and educational services were available in their community.

The ISS evaluator deemed defendant emotionally stable, with "no signs of any substance habits," but noted he "display[ed] a certain degree of anxiety, due to the uncertainty surrounding his children's situation, as he does not know what exactly ensued in the U.S. in relation to his wife and children." Defendant told the evaluator Carla "was a responsible and loving mother, [who] always properly cared for their children and provided them with protection and care." Defendant's paternal extended family did not speak English; defendant intended to teach the boys Spanish. He said he had been in "constant phone contact" with the boys three years prior to the evaluation, and last spoke with Carla two years prior.

On December 5, 2018, after learning ISS recommended that reunification "can be considered," defendant told the Division he wished to be reunited with his sons. The ensuing paternity test[7] was delayed, however, because the Division was unable to contact defendant until three months later.

---

[7] The Division determined a paternity test was necessary when it discovered Carla's son, Damian, was the son of Juan and not M.E.P., as reflected in Damian's birth certificate.

On March 7, 2019, the Division located defendant in Texas; he had crossed the border illegally and was detained by Immigration and Customs Enforcement (ICE). The Division contacted ICE seeking to delay defendant's deportation to complete his paternity test. Claiming he entered the United States because he was concerned about his sons, defendant agreed to submit to the test. Defendant maintained that he wished to reunite with his children. The Division served defendant with the Title Nine abuse or neglect complaint (FN matter), and provided him with an application for assigned counsel in the FN matter. On March 27, 2019, testing confirmed Sean's paternity for all three boys. Around March 29, 2019, defendant was deported to Ecuador and failed to contact the Division, as previously agreed.

One month later, on May 2, 2019, the Division contacted defendant, advising he was the biological father of Adam, Noel, and Duke. The Division confirmed defendant's interest in caring for his sons, and his availability to attend the May 21, 2019 court date telephonically. Because he worked during the week, defendant informed the Division he only was available to speak with the children by video calls on weekends. Defendant failed to contact the worker on May 9, 2019, as scheduled.

9

Defendant apologized to the worker the following week, during their May 15, 2019 telephone call, claiming he had "lost his phone and just got a new one." The caseworker informed defendant that the Division intended to recommend changing the case goal to adoption because Carla had not remediated the reasons for the children's removal. Defendant reiterated his desire for reunification with the children in Ecuador. He also requested video calls with his sons. Because the current court order prohibited contact between defendant and the boys, the worker said she would arrange for calls after receiving permission from the court.

In its May 17, 2019 Court Report in the FN matter, the Division advised the Family Part judge that defendant's international home study had been completed with "no concerns" noted. In its summary of the ISS report the Division noted "if [defendant] were to be considered as a primary caretaker, there should be a plan in order to reintroduce him to the children's lives." The Division further indicated that the assessment failed to address defendant's substance abuse history.[8]

---

[8] The Division annexed the report to its responding brief on appeal. Although the report was not admitted in evidence, the same judge who conducted the guardianship trial also was assigned to the FN matter.

A-4185-19

On July 5, 2019, the Division filed a guardianship complaint, seeking in relevant part, to terminate the parental rights of Carla and defendant to Adam, Noel, and Duke. Among other things, the Division asserted "it was in the process of assessing [defendant] and his relatives." The complaint did not reference the August 22, 2018 ISS evaluation.

On July 30, 2019, the judge granted the Division's motion to dismiss the FN matter, over the objection of defendant's assigned counsel.[9] The judge noted "the guardianship m[atter] needs to go forward to determine whether there can be any type of reunification or whether termination is appropriate." The Division informed the judge that defendant was willing to submit to a psychological examination, which was arranged through ISS.

In addition, defense counsel noted the Division was attempting to implement video calls between defendant and the children, but the boys only spoke English and defendant only spoke Spanish and, as such, the Division was exploring interpreting assistance. The Division added that it also wanted the children's therapist to confirm "there [wa]s no contraindication" by that contact.

The following month, on August 13, 2019, Dr. Dyer conducted bonding assessments of the boys with their resource parents at his office. Dr. Dyer

---

[9] The same attorney represented defendant in the FN and guardianship matters.

 A-4185-19

interviewed Adam, age six, and Noel, age five, and conducted a bonding assessment with their resource parents. Three-year-old Duke was not interviewed. At the time of Dr. Dyer's evaluations, the children had resided with the resource parents for thirteen months.[10]

Defendant appeared telephonically at the next court hearing on September 3, 2019. As of that date, defendant still was "being assessed for placement," his psychological evaluation having been scheduled the week prior. The deputy attorney general added, however, that notwithstanding the results of defendant's evaluation, the Division would need to determine whether the children could overcome the geographic and language changes in view of the trauma they suffered while living with Carla and Juan, and "the facts and the concerns that preceded and led to their fourteen months in resource homes in Pennsylvania." According to the deputy attorney general: "Having said that, if it is safe and in the children's best interests for the children to return to [defendant], the Division would absolutely support that and do whatever is necessary in order to make that transition."

---

[10] By the time of trial, the children had lived with their resource parents for seventeen months.

Defendant completed the psychological evaluation in September 2019. Although he had completed a urine screening in June 2019, a substance abuse evaluation was never conducted.

Video calls between defendant and the boys also commenced in September 2019. While the caseworker was placing a call, Adam noticed defendant's full name on the cellphone and stated, "[H]e has the same last name as us. That's because he is our dad." Noel agreed, stating, "Yes, he's our dad." Upon seeing defendant's photograph on the phone, they told the worker they remembered defendant. Notably, Dr. Dyer did not interview defendant or observe his interactions with the children during their video visitation telephone calls.

At trial, Dr. Dyer testified that during his August 13, 2019 bonding evaluation, Noel and Adam referred to their resource parents as "mom and dad." They told Dr. Dyer they did not know anyone named Sean or have relatives in Ecuador. Both boys "interacted in a very affectionate and enthusiastic manner with the resource parents, who were similarly affectionate and appropriate with them." Dr. Dyer elaborated: "The interaction was not that much different from the normal interaction of children who had been with their birth parents in an

13

uninterrupted household for years. So, based on that, it's my inference that these children have formed a significant degree of attachment to the resource parents."

Although the resource parents told Dr. Dyer that Adam "did not display behavior problems," the expert cited a behavioral assessment report indicating Adam "has some problems with aggression." Dr. Dyer told the judge both Noel and Adam "present[ed] with some behavior problems."

As to whether it would be in the boys' best interest to be placed with defendant, Dr. Dyer opined:

> I want to emphasize, that as [defense] counsel correctly pointed out, I have not met with [defendant], had no direct contact with him; and therefore, I cannot form any type of opinion concerning [defendant] personally. But my concern resides in the impact of [sic] these children of removing them from a resource home where they have formed an attachment to their caretakers, it's after a placement, though, I think it's seventeen months this time around, after a little bit under a year with their mother. And prior to that, a placement of somewhat over a year in resource care in the State of Pennsylvania.
>
> With children who have had this kind of history, of disrupted attachments, to send them to the home of someone who is a stranger to them, and I asked the two older boys, A[dam] and N[oel], if they knew anybody named S[ean], if they knew if they had any relatives in Ecuador, and they both denied that. So, for all practical purposes, these children's birth father is a stranger to them. To place children with this background with a stranger, is taking an awfully big risk. That would be

compounded in this case by transferring them to an entirely different culture where they are not familiar with anything. And they would be confused, disoriented at first, and it's my prediction that because of their attachment history and their current attachment to their resource parents, that going forward they would be damaged psychologically by removing them and placing them with a parent who is a stranger to them. In particular, the danger that I foresee would be an impairment in the basic trust of all three children, an impairment in their self-esteem, and an impairment in the capacity of these children to form new attachments to anybody. Not that these factors would be totally eradicated, but there would be a significant amount of damage in these areas: Self-esteem, basic trust, and capacity to form new attachments.

[(Emphasis added).]

According to Dr. Dyer, the children would experience "a short-term reaction of distress; disorientation" if they were "uprooted" from their present placement and "sent to Ecuador." He further "predicted long[-]term" harm from "the cumulative effect of yet another disruption of the continuity of these children's care, piled on top of previous disruptions and previous experiences of abuse and neglect."

On cross-examination, Dr. Dyer acknowledged that because he had never met defendant, he could not express any opinion as to whether defendant or "any individual" would be able to mitigate the psychological harm caused by separating the children from their resource parents. Dr. Dyer also stated it was

15

"entirely possible" that defendant's parents would be able to assist the children in their "adjust[ment] to a new culture," but he could not opine either way. According to Dr. Dyer: "There [wa]s no feature of the house that would raise suspicions that [the children] are not going to be loved and valued there and adequately cared for. The [grand]parents and [defendant] got a clean bill of health from the international home study."

Acknowledging defendant claimed there was a bilingual school in his area, Dr. Dyer was unsure whether that was the same school defendant had selected for the children as referenced in the ISS report. In any event, Dr. Dyer acknowledged he "would like to know more about it, what the quality of the education is, whether the instructions [are] primarily in Spanish with some English thrown in because there are gradations of bilingual education."

As of the time of trial, the resource parents were facilitating calls between defendant and the boys on weekends. The caseworker testified that "D[uke] did not appear to know [defendant]." However, "A[dam] and N[oel] refer to [defendant] as 'Daddy S[ean]'" They also referred to J.M.E. as "Daddy J[uan]."

Based on the evidence adduced at the guardianship trial, the judge analyzed each prong of the best interests test, emphasizing the importance of permanency and stability for the children. In doing so, the judge credited the

16 <span>A-4185-19</span>

unrefuted testimony of the Division's witnesses. In particular, the judge found the expert opinion of Dr. Dyer "extremely persuasive" here, where defendant "is a stranger" to the children, who "would suffer psychological harm if sent to live with [him] in Ecuador."

Noting defendant presented no factual or expert testimony to refute the Division's evidence, the trial judge noted two statements contained in the record "called into question" defendant's veracity and judgment. For example, defendant's statement to the ISS evaluator "that he was in constant contact with his children, prior to the 'events that lead to their institutionalization'" was incredible "when juxtaposed with Dr. Dyer's credible testimony that the children did not even know who [defendant] was." Secondly, the judge found defendant's statement that Carla "was a responsible and loving mother[,]" who "always properly cared for the children and provided them with protection and care" was directly contradicted by the police officer's description of the "deplorable" state of the family's Stroudsburg home.

Pertinent to this appeal, over defense counsel's objection, the judge admitted Dr. Dyer's October 2019 email, recommending against placement of the boys with defendant in Ecuador, and his testimony that the children would suffer enduring psychological and enduring emotional harm if they were

removed from their resource home.  Counsel argued Dr. Dyer's opinion was "net" primarily because he had not interviewed defendant and his reasons, in part, were based on Dr. Stilwell's bonding assessment of the maternal grandmother.  According to the judge, Dr. Dyer's testimony did not relate to defendant, but rather to "the effect of another removal, regardless of [with] who[m] the children are placed."  Although the email was brief, the judge found the email merely summarized the expert's reasons that were set forth in his lengthy report.

Ultimately, the trial judge concluded it was in the best interests of Adam, Noel, and Duke to terminate defendant's parental rights.  This appeal followed.

II.

Our scope of review on appeal from an order terminating parental rights is limited.  N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). We will uphold a trial court's factual findings if they are "supported by adequate, substantial, and credible evidence."  N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014).  "When the credibility of witnesses is an important factor, the trial court's conclusions must be given great weight and must be accepted by the appellate court unless clearly lacking in reasonable support." N.J. Div. of Youth & Fam. Servs. v. F.M., 375 N.J. Super. 235, 259 (App. Div.

2005). No deference is given to the court's legal interpretations, which we review de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995); see also N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 183 (2010).

It is axiomatic that parents have a constitutionally protected right to the care, custody, and control of their children. N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012). That right, however, is not absolute. K.H.O., 161 N.J. at 347; see also R.G., 217 N.J. at 553. "It is a right tempered by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447. At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009). Importantly, "[c]hildren must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement." N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007).

To effectuate these concerns, the Legislature created a test for determining whether a parent's rights must be terminated in the child's best interests. When

A-4185-19

the guardianship judgment was issued in this case, N.J.S.A. 30:4C-15.1(a) required that the Division satisfy the following four prongs by clear and convincing evidence:

> (1)   The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2)   The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;[11]
>
> (3)   The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4)   Termination of parental rights will not do more harm than good.

---

[11] Effective July 2, 2021, the Legislature enacted L. 2021 c. 154, amending laws pertaining to the standards for terminating parental rights and the placement of children with relatives or kinship guardians. N.J.S.A. 30:4C-15.1(a)(2) was amended to exclude from consideration the harm to children caused by removal from their resource parents. Accordingly, the second sentence of prong two was stricken from the revised statute. We discern no reason to apply the revised statute retrospectively. See James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 563 (2014) (recognizing generally statutes should be applied prospectively). Defendant has not argued otherwise. See R. 2:6-11(d).

A-4185-19

The four prongs are not independent of one another.  N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 379 (App. Div. 2018).  Instead, they "are interrelated and overlapping," N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006), and should form "a composite picture" of what is in the best interests of the child, N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 280 (2007) (quoting F.M., 375 N.J. Super. at 258).  Parental fitness is the crucial issue.  K.H.O., 161 N.J. at 348.  However, parents in such proceedings should not be presumed unfit, and "all doubts must be resolved against termination of parental rights."  Id. at 347.  Determinations of parental fitness are fact sensitive and require specific evidence.  Id. at 348.  Ultimately, "the purpose of termination is always to effectuate the best interests of the child, not the punishment of the parent."  Id. at 350.

Prongs One and Two

Both the first and second prongs of the best interests test address the harm caused to children by parental conduct and the parent's failure to mitigate that harm, focusing on the impact of the harm caused by the parent-child relationship on the child over time.  N.J.S.A. 30:4C-15.1(a)(1) and (2).  These prongs "are related to one another, and evidence that supports one informs and may support

21

the other as part of the comprehensive basis for determining the best interests of the child." In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999).

Termination of parental rights may be supported by evidence "that the parent substantially caused, directly or indirectly, the harm to the child." N.J. Div. of Youth & Fam. Servs. v. D.M., 414 N.J. Super. 56, 81 (App. Div. 2010). It is well settled that "harm" in this context is not limited to physical harm. In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (holding "[s]erious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights."). Therefore, "courts must consider the potential psychological damage that may result from reunification as the 'potential return of a child to a parent may be so injurious that it would bar such an alternative.'" N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 480-81 (App. Div. 2012) (quoting N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 605 (1986)). Courts need not wait until the child is irreparably harmed before concluding these prongs are satisfied. D.M.H., 161 N.J. at 383.

For instance, the failure of a parent to provide a "permanent, safe, and stable home" engenders significant harm to a child. Ibid.; see also M.M., 189

22

N.J. at 293 (upholding the trial court's termination of a father's parental rights where his wife, who had the intellectual functioning of a seven-year-old, created a dangerous and destabilizing environment). Similarly, "[a] parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." D.M.H., 161 N.J. at 379. Such withdrawal constitutes a "failure to provide even minimal parenting . . . ." Ibid.

The focus under the first prong is not on any "single or isolated harm," but rather on "the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. Under this prong, the Division must demonstrate harm to the child resulting from the parental relationship "that threatens the child's health and will likely have continuing deleterious effects on the child." Id. at 352; see also N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 25 (2013). The Division must proffer adequate evidence of "actual harm or imminent danger" to the child. Id. at 30.

The second prong of the best interests standard relates to parental unfitness. K.H.O., 161 N.J. at 352. In considering this prong, the court should "determine whether it is reasonably foreseeable that the parent[] can cease to inflict harm upon the child." A.W., 103 N.J. at 607. "The second prong, in

23

many ways, addresses considerations touched on in prong one."  F.M., 211 N.J. at 451.

In the present matter, the trial judge's findings as to prongs one and two overlapped.  The judge recognized:  (1) there was no suggestion in the record that defendant physically harmed his sons; and (2) "little, if no evidence, of [defendant's] parental unfitness."

Instead, the judge found defendant failed to nurture the boys during his prolonged absence and protect them from Carla's "instability, neglect, and violence."  As one example, because the children lived in the Dover home when Carla subjected Karmen to "horrific" physical abuse, they "became victims of multiple psychological trauma."  The judge cited evidence in the record of Carla's "ear pulling" and "slap[ping]" of the children, and their "several traumatic removals, returns[,] and removals."

The judge also emphasized the children were "attached to their respective caregivers, with whom they have resided for approximately twenty-four months" at the time of his decision.  The judge elaborated:

> The absence of nurture and protection are harm that might, and I say, might, be mitigated under different circumstances with children who have not suffered what these children have suffered.  Perhaps children differently situated could be removed from the United States, placed in Ecuador with a father that

A-4185-19

doesn't even speak their language, in a country where they don't speak their language, maybe that could happen under different circumstances and the children be safe, but unfortunately, in this case, . . . [defendant]'s absence over the last five years contributed to the additional trauma suffered by these children, the neglect and abuse in the home of [Carla], the repeated removals and placements throughout the children's lives, as Dr. Dyer testified, . . . "has taken their toll on A[dam], N[oel] and D[uke]." Dr. Dyer opined that removal from their resource parents and placement with [defendant] in Ecuador, "a stranger to them, no more than a virtual acquaintance, to a home in a country where they cannot even speak the language, will cause long-term emotional harm." There is absolutely no persuasive factual or expert evidence, to the contrary, in this record, I find.

Although the trial judge also quoted extensively from the "very positive" ISS home study, he concluded defendant was "unable and/or unwilling to eliminate the harms facing his children and he is unable or unwilling to provide a safe and stable home."

Moreover, the judge was persuaded by Dr. Dyer's "unrebutted expert testimony" that removal and placement of the children in Ecuador "will cause untold damage." Recognizing Dr. Dyer had "no opinion" of defendant's "parental capacity, having never met the man," the judge cited Dr. Dyer's testimony that defendant was a "stranger" to his children and, as such, "they would suffer psychological harm if sent to live with [him] in Ecuador." The

judge also considered defendant's assessment of Carla "as a responsible and loving mother . . . almost unfathomable."  The judge concluded the children's "current and stable environment . . . must be fostered and maintained."

Prong Three

On appeal, defendant limits his challenge of prong three to the first clause, which requires that the Division make "reasonable efforts" to provide services.

"Reasonable efforts" are defined as:

> attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure, including, but not limited to:
>
> (1)  consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2)  providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3)  informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4)  facilitating appropriate visitation.
>
> [N.J.S.A. 30:4C-15.1(c).]

The focus centers on the Division's efforts toward "reunification of the parent with the child and assistance to the parent to correct and overcome those

circumstances that necessitated the placement of the child into foster care." K.H.O., 161 N.J. at 354. "[W]here one parent has been the custodial parent and takes the primary . . . role in caring for the child[], it is reasonable for [the Division] to continue to focus its efforts of family reunification on that custodial parent, so long as [it] does not ignore or exclude the non-custodial parent." D.M.H., 161 N.J. at 393. "The diligence of [the Division's] efforts," however, "is not measured by their success," but rather "against the standard of adequacy in light of all the circumstances of a given case." Ibid. Those circumstances include "the individual case before the court, including the parent's active participation in the reunification effort." Id. at 390.

Assessing prong three in this case, the trial judge attributed "any initial delay" in services to defendant's conduct: defendant's DWI led to his deportation in 2015; his illegal reentry led to his second deportation in 2019. The judge found against those circumstances, the Division exerted efforts that "border[ed] on Herculean" by delaying defendant's second deportation to serve him with the FN complaint and facilitate the assignment of counsel.

Notably, however, the trial judge expressly found defendant's psychological evaluation "was wholly inadequate and the Division should have followed up with additional evaluations and recommendations and services."

27

But the judge further found "that particular failure" did not undermine "the entire panoply of services" under the circumstances of this case. Those services "include[d] the home study, paternity testing, a psychological evaluation, . . . [a] substance abuse evaluation and referral to services recommended therefrom[,] [v]irtual communication with his children[,] and delaying his second deportation with . . . the provision of counsel." The judge rejected defendant's argument that the Division failed to facilitate contact with the children, crediting the caseworker's testimony that defendant was only available for video calls on weeknights and weekends, and the conversations with the children was limited due to the language barrier.

Ultimately, the judge determined the Division made reasonable efforts in view of the "barriers posed" by defendant's residence in Ecuador. Accordingly, the judge found "the Division was correct to focus [its] efforts on reunification with [Carla,] the custodial parent here in the U.S., rather than with [defendant,] who resided in Ecuador and was a stranger to these children."

Prong Four

The fourth prong "is related to the first and second elements of the best interest standard, which also focus on parental harm to the children." D.M.H., 161 N.J. at 384. "The question to be addressed under that prong is whether, after

28

considering and balancing the two relationships, the child[ren] will suffer a greater harm from the termination of ties with [their] natural parents than from the permanent disruption of [their] relationship with [their] foster parents." K.H.O., 161 N.J. at 355.

"[T]o satisfy the fourth prong, the State should offer testimony of a 'well [-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation' of the child's relationship with both the natural parents and the foster parents." M.M., 189 N.J. at 281 (emphasis added) (quoting In re Guardianship of J.C., 129 N.J. 1, 19 (1992)). "Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that his most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453. Indeed, the "child's need for permanency is an extremely important consideration pursuant to this prong." R.G., 217 N.J. at 559 (citations omitted).

As to the final prong, the trial judge "applaud[ed]" defendant for "coming forward now and offering to be, actually no, fighting to be a placement for [his sons]." But the judge concluded "the trauma visited upon these children during the years of [defendant]'s absence ha[s] left these children unable to endure such a transition." To support his conclusion, the judge cited "Dr. Dyer's unequivocal

and unrebutted expert opinion . . . that the children would suffer longtime harm if placed in [defendant]'s care."  The judge reiterated that defendant was a "stranger" to the children, unable to "speak their language" and "lives in a country where their language is not spoken."  In sum, the judge concluded that although Dr. Dyer did not form an opinion about defendant's parenting ability, Dr. Dyer determined "there exists no relationship among [defendant] and the children that could ever hope to mitigate the harm of removing them yet again and placing them in Ecuador."

III.

At the outset, we discern no error in the trial judge's determination that the Division satisfied prong one by clear and convincing evidence.  Defendant's prolonged absence from his sons' lives – resulting from defendant's incarceration and two-time deportation – directly affected his ability to nurture and protect Adam, Noel, and Duke.  As the judge aptly recognized, during defendant's absence, the boys were exposed to Carla's "instability, neglect, and violence," see M.M., 189 N.J. at 282, and have suffered psychological trauma, see K.L.F., 129 N.J. at 44.  Defendant has not presented any evidence to suggest otherwise. We therefore affirm the trial judge's findings as to prong one substantially for the reasons expressed in his oral decision.

On this record, however, we cannot conclude the Division satisfied the remaining prongs by clear and convincing evidence.

With regard to prong two, the judge found "little, if no evidence" that defendant was unfit. Instead, the judge determined Dr. Dyer's testimony established that another removal – this time from resource parents, with whom the children are bonded – would cause "serious and enduring emotional or psychological harm" under the second sentence of then-enacted prong two. Nonetheless, Dr. Dyer acknowledged ISS's favorable home study, which raised no "suspicions" about the love and care the children would receive if they were reunified with defendant in Ecuador.

Not having met defendant, however, Dr. Dyer could not opine whether defendant would be able to mitigate the harm caused by the children's separation from the resource parents. Dr. Dyer further acknowledged it was "entirely possible" that the paternal grandparents could assist in that adjustment. Dr. Dyer also stated he needed more information as to whether the children's prospective school offered bilingual classes and services.

We are therefore concerned that Dr. Dyer's opinion was rendered without the benefit of having met defendant or observed defendant interacting with his children during their telephonic visitation. Unlike the trial judge, we cannot

31

conclude on this record that defendant's prior absence from the boys' lives will impede his present ability to ease their transition to reunification. Because the fourth prong is best satisfied following the expert's evaluation of the children with their biological and resource parents, M.M., 189 N.J. at 281, and defendant was never included in such evaluation, on this record we also cannot conclude this prong was met.

As to prong three, as the trial judge correctly observed, the Division failed to obtain a more thorough psychological evaluation and facilitate any follow-up services after receiving ISS's "wholly inadequate" evaluation. Also, contrary to the judge's finding that the Division facilitated a substance abuse evaluation and referral to recommended services, as the Division acknowledges on appeal, "ISS never conducted the substance abuse evaluation." It is unclear from the record how, if at all, these deficiencies impacted Dr. Dyer's conclusions.

We recognize there is no indication in the record whether a remote bonding assessment would even be possible, given defendant's inability to return to the United States for in-person interaction with his children. Accordingly, on remand the trial judge shall conduct a hearing as to whether the Division can conduct a meaningful remote bonding evaluation of defendant and the children, including the circumstances under which the evaluation could occur. The judge

shall also order any other evaluations the Division's expert deems necessary to determine whether defendant has the ability to mitigate the harm that would be caused by the boys' separation from their resource parents.

In conclusion, we affirm the trial judge's decision as to prong one of the best interests test. Because we cannot determine whether further proceedings could develop a more complete record enabling us to conduct appropriate appellate review as to whether the Division has satisfied its burden under prongs two, three, and four, we remand to the Family Part. The judge shall decide whether under the unusual facts presented, further evaluations of defendant, his home in Ecuador, and any bonds he may have forged with his children are possible, and, if so, whether the Division should be ordered to complete those evaluations. We leave to the judge's discretion how to conduct this aspect of the remand, including whether testimony and additional evidence is necessary for the judge to decide whether such further evaluations are reasonably possible under the circumstances. The remand shall be completed within ninety days, and the judge shall file a written statement of his decision. We retain jurisdiction pending the judge's decision.

A-4185-19

Affirmed in part; vacated and remanded in part.  Jurisdiction is retained.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4185-19