# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2394-24
              A-2396-24

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

       Plaintiff-Respondent,

v.

L.J., a/k/a L.D. and J.D.,

       Defendants-Appellants.

_____

IN THE MATTER OF
J.D., a minor.

_____

> Argued March 11, 2026 – Decided April 6, 2026
>
> Before Judges Gummer, Paganelli, and Vanek.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FG-01-0009-24.
>
> Eric Storjohann, Assistant Deputy Public Defender, argued the cause for appellant L.J. (Jennifer N. Sellitti,

Public Defender, attorney; Eric Storjohann, on the briefs).

James D. O'Kelly, Designated Counsel, argued the cause for appellant J.D. (Jennifer N. Sellitti, Public Defender, attorney; James D. O'Kelly, on the brief).

Meaghan Goulding, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Meaghan Goulding, on the brief).

Julie E. Goldstein, Assistant Deputy Public Defender, argued the cause for minor J.D. (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Julie E. Goldstein, of counsel and on the brief).

PER CURIAM

In these consolidated cases, defendants L.J. (Lisa) and J.D. (Jack) appeal from the Family Part's March 20, 2025 judgment terminating their parental rights to their biological son, J.D. (John), and granting the Division of Child Protection and Permanency (the Division) guardianship of John with the plan that he be adopted.[1] Defendants argue the trial court erred in finding the Division had proven by clear and convincing evidence the four prongs of the best-interests test necessary for the termination of parental rights. See N.J.S.A.

---

[1] We refer to the parties and the child involved in this case using either initials or pseudonyms to protect their privacy and the confidentiality of these proceedings. R. 1:38-3(d)(12).

30:4C-15.1(a).  The Division and John's law guardian contend the judgment is supported by substantial credible evidence in the record.  Having reviewed the record in light of the parties' contentions and the applicable law, we affirm.

I.

Given that the parties are well familiar with the extensive factual and procedural background of this matter, and the record of the five-day trial, we need not detail the extensive record in this opinion.  The following summary will suffice.

John was born in December 2018.  On September 16, 2021, the Division received a referral from the Atlantic City Police Department, reporting that Lisa and John had been walking naked on Atlantic City streets.  Jack was not with them initially but eventually arrived on the scene, appearing to be "under the influence of drugs or alcohol."  Responders described Lisa as "incoherent and delirious" and transported her to a hospital emergency room.  That same day, the Division executed a notice of emergency removal.  The Division initially placed John with his maternal uncle, P.J.  In June 2022, the Division placed him with his maternal uncle, B.J. (Brad), because P.J. had fallen ill.  Since then, John, who is now seven years old, has resided with Brad and his wife S.J. (Sara), who became his resource parents.

On October 7, 2021, the return date of the order to show cause, the court conducted a hearing and entered an order continuing custody of John with the Division. The order required Lisa to participate in a program at a behavioral health facility, Jack to attend a substance-abuse evaluation, and both defendants to submit to random drug and alcohol screenings. The court permitted supervised visits between Lisa and John and suspended Jack's visitation rights until he was "located and engage[d] in the case planning process." The Division initiated a "litigation search" for Jack using his last known addresses and telephone numbers and subsequently continued its "active search" for Jack. It contacted welfare and other agencies for Jack's last-known addresses and requested updated searches every six months.

On November 15, 2021, Lisa attended a psychological evaluation with psychologist Gregory C. Gambone, Ph.D., and reported a history of marijuana, alcohol, and cocaine use. Dr. Gambone diagnosed Lisa with, among other conditions, bipolar disorder and dependent personality disorder with avoidant features. He recommended medication review, parenting-skills training, individual psychotherapy, and family therapy with John. He identified ongoing risks related to homelessness and untreated mental illness and concluded Lisa

could not independently parent John at that time. He further recommended Lisa's contact with John be supervised.

In subsequent orders, the court directed Lisa to attend psychiatric evaluations and to participate in mental-health and parenting-skills counseling as well as other family and individual counseling. In February 2022, Lisa was admitted to a hospital psychiatric unit after she was arrested and charged with criminal mischief for throwing rocks at a hotel and convention center. Police believed she was "having a mental-health crisis." Following that incident, Lisa received inpatient and outpatient treatment, participated in individual therapy, parenting-skills classes, substance-abuse evaluations, and random urine screens.

On August 2, 2022, the court entered a consent order granting Lisa four hours of unsupervised visitation with John per week. The court ordered that Jack was "still restrained from any contact and/or any of [Lisa's] visits." In a September 29, 2022 permanency order, the court found Lisa "ha[d] been compliant with all Division requested services." The court ordered that Lisa have "a minimum of [four] hours of visitation" each week with John and barred Jack's presence at those visits. The court continued the suspension of Jack's visitation rights, finding it was not "safe to return [John] to [Jack] as [Jack] ha[d] been missing during the litigation and ha[d] not engaged in services."

5

The court conducted permanency hearings on November 30, 2022, and January 27, 2023.  At both of those hearings, the Division sought additional time to work towards Lisa's reunification with John.  In permanency orders issued after each hearing, the court approved the proposed plan, finding Lisa "compliant with all Division requested services."[2]  The court concluded it was not "safe to return" John to Jack because Jack had "been missing during the litigation and ha[d] not engaged in services."  In separate orders, the court ordered Lisa to attend mental-health counseling and parenting-skills training, comply with recommendations related to that treatment and training, and submit to random drug and alcohol screenings.  The court permitted Lisa to have supervised and unsupervised visits with John and ordered that Jack "not be present during" those visits.  The court ordered Jack to participate in substance-abuse evaluations and treatment and submit to random drug and alcohol screenings.  It continued the suspension of Jack's visitation rights due to his non-participation in the litigation and court-ordered services.

---

[2]  In January 2023, the Division was advised Lisa had missed several appointments with her therapist and her psychiatrist.  The record is not clear as to whether that information was before the court when it concluded in the January 27, 2023 order she had been compliant.

A-2394-24

On February 13, 2023, while being transported from an unsupervised visit with Lisa, John told a Division case worker he had seen Jack during his visit with Lisa and that both defendants had instructed him not to tell anyone about seeing Jack. When questioned by a Division case worker, Lisa initially asserted John had lied about seeing Jack. She later admitted Jack had been at her home but denied John had seen him. Given Jack's presence at the house during John's visit, which was contrary to multiple orders, Lisa's subsequent visitation with John was supervised.

On March 21, 2023, the court conducted a fourth permanency hearing. The Division presented a plan extending reunification efforts concurrent with a plan of adoption. The court approved the plan and ordered Lisa to continue to engage in mental-health treatment and other services to "work towards unsupervised time and reunification."

Jack appeared in court for the first time at a May 16, 2023 permanency hearing. The court adjourned the hearing to allow Jack time to obtain counsel. Jack informed a Division case worker later that day he had known John was living in a resource home. On May 25, 2023, the court conducted a fifth permanency hearing. The Division presented a plan for "[t]ermination of [p]arental [r]ights followed by adoption." The court rejected the plan as

7

"inappropriate and unacceptable" because Lisa "ha[d] been engaging in court[-]ordered services" and Jack had appeared in the litigation and had "indicated a desire to engage in services." The court ordered Lisa to undergo psychiatric and psychological evaluations, Jack to undergo a substance-abuse evaluation and treatment, and both defendants to attend mental-health counseling, comply with recommendations, and submit to random drug and alcohol screenings. The court ordered that defendants have separate supervised visitation with John.

In May and June 2023, Dr. Gambone evaluated Lisa's "psychological functioning, cognitive functioning, parenting capacity, and mental health needs." Dr. Gambone diagnosed her with "[b]ipolar [d]isorder with psychotic features" and "[d]ependent [p]ersonality [d]isorder with [a]voidant features." He concluded she had "a superficial understanding of the physical, emotional, intellectual, and social needs of her son" and "a reported history of disregarding her responsibility for her son's health, safety, and stability." He found the evidence "suggest[ed] that [Lisa] has been unwilling or unable to consistently meet the parenting needs of her son," although he noted her willingness "to participate in recommended training and treatment services." He recommended Lisa participate in a medication review with a psychiatrist, individual psychotherapy, and therapeutic visitation with John. He also recommended that

Lisa "should not currently be considered capable of adequately parenting . . . [John] on an independent basis" and that her contact with him "be maintained under supervision." He opined that allowing Lisa to have unsupervised contact with John should be contingent on Lisa's "consistent compliance" with the medication review and psychotherapy as well as other considerations.

On June 26, 2023, the court conducted a sixth permanency hearing. The Division sought a ninety-day extension to continue working toward reunification. The court found the plan acceptable and granted the extension. The court again ordered defendants to comply with the programs outlined in its prior orders and continued supervised visitation with John.

On July 5, 2023, Jack appeared for a psychological evaluation with psychologist Meryl E. Udell, Psy.D. Dr. Udell concluded Jack should be screened randomly for drugs and alcohol and should undergo a substance-abuse evaluation, complying with any recommendations from that evaluation. She found it "hard to accept . . . he does not know [Lisa] has mental illness." She recommended that any visitation with John be supervised and that Jack "demonstrate at least nine to twelve months of stable housing" before any consideration be given to reunification. Jack completed a substance-abuse evaluation, was found to be "at high risk of continued drug use," and received a

referral for intensive outpatient treatment. Jack did not act on that referral and was discharged from the treatment program for being non-compliant.

In July 2023, with the court's permission, the resource parents relocated to Florida with John. Pursuant to an order, the Division paid for Lisa to travel to and stay in Florida for multiple supervised visits with John between July 2023 and July 2024. Jack was not in contact with the Division from July 5, 2023, through September 18, 2023. He had four supervised visits with John in Florida. He stopped traveling to Florida after his identification was stolen. The Division offered to help him obtain new identification so he could continue to travel to Florida for his visits with John, but he declined the offer.

On October 20, 2023, the court conducted a seventh permanency hearing. The Division presented a plan to terminate defendants' parental rights followed by adoption. The court found the plan acceptable and approved it. In December 2023, the Division filed a complaint, seeking the termination of defendants' parental rights.

The trial commenced on December 9, 2024. The Division presented six witnesses: a Division adoption worker; three law-enforcement officers, who respectively testified about Lisa's September 2021 and February 2022 incidents and Jack's June 2024 arrest for possession of drug paraphernalia (a crack pipe);

Brad; and psychologist Alan J. Lee, Psy.D., who in the spring of 2024 had conducted psychological evaluations of defendants and bonding evaluations between John and each biological and resource parent. The Law Guardian joined with the Division in supporting termination and called Sara as a witness. Lisa testified on her own behalf and presented Dr. Gambone as a witness. Jack did not testify or call any witnesses.

Dr. Gambone testified he had continued to treat Lisa, had evaluated her again in 2024, and had identified some improvement in her condition. He found "no indication there's ever been another manic episode" and testified Lisa's depression had "diminished" and that, although she at times "becomes somewhat compulsive," she had "developed a more mature and thoughtful approach to . . . complying with visitation and services." He also indicated he would revise Lisa's earlier diagnosis of bipolar disorder to "[d]ysthymia," which he described as a "low-grade but present depression" that does not "[rise] to the level of paranoid ideation." Dr. Gambone concluded Lisa presented "no imminent risk of harm to herself" or John. However, he recommended Lisa remain in treatment with him and did not "count[] out the need for psychiatric intervention." He did not recommend reunification between Lisa and John. Instead, he suggested Lisa have unsupervised visitation with John "because she was starting to control

herself." Dr. Gambone proposed "incremental periods of . . . unsupervised time," beginning with two-hour visits, as an "empirical test" to assess Lisa's functioning.

Dr. Lee testified he "would not" and could not "support" Dr. Gambone's recommendation for unsupervised visitation. He explained he had a "plethora of concerns" regarding Lisa's functioning, particularly "in the context of this child." Diagnosing her with "schizoaffective disorder bipolar type" and unspecified depressive, anxiety, and personality disorders, he found "[Lisa] ha[d] significant mental illness . . . that ha[d] adversely impacted her ability to . . . accurately and appropriately perceive, respond, and behave in her caretaking to" John. He determined Lisa "lack[ed] some areas of parenting knowledge and parenting skills which . . . raise[d] concerns of her ability to accurately and appropriately respond . . . to [John's] needs." He observed that, "while it's possible . . . [Lisa] may have moments where she is more stable. . . . the likelihood of her having significant and lasting changes in her mental health and overall functioning is low or poor." Accordingly, he concluded Lisa should not serve as an independent caretaker "at the time and within the foreseeable future."

Dr. Lee reached a similar conclusion with respect to Jack, finding "significant concerns" regarding Jack's "limited involvement" and inability to

meet John's needs in a "consistent, continuous way." He diagnosed Jack as having an "unspecified disruptive impulse control and conduct disorder" and an "unspecified personality disorder with avoidant and . . . schizoid traits." Dr. Lee testified "there were significant concerns against [Jack] being an independent caretaker for . . . [John], at the time and within the foreseeable future." In his written evaluation, Dr. Lee concluded "[Jack's] prognosis for significant and lasting changes [wa]s poor."

Dr. Lee also testified about the May 2024 bonding evaluations. He found John had an "ambivalent and insecure attachment" with both Jack and Lisa and that neither relationship constituted a "significant positive psychological attachment or bond." He concluded there was a "low risk" John would suffer harm if either relationship was terminated. By contrast, Dr. Lee found John had formed a "significant and positive psychological attachment and bond" with both Brad and Sara and concluded terminating those relationships posed a "significant risk of [John] suffering severe and enduring psychological or emotional harm."

After reviewing the testimony and other evidence, the trial court concluded the Division had met its burden of proof as to each of the four statutory factors. The court placed a decision on the record and issued a written

13

decision on March 18, 2025, and entered a judgment terminating defendants' parental rights on March 20, 2025. These appeals followed.

## II.

The termination of parents' rights to raise their children is a matter of constitutional magnitude. See In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). Those rights, however, are "not absolute" and are limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012).

"Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). Our courts have acknowledged "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

Consequently, the law requires a balancing of those two competing interests: the parents' constitutionally-protected right to raise their children, absent state interference, and the State's responsibility to protect the welfare of children. N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 20 (2023). That balancing "is achieved through the best interests of the child standard." Ibid. (quoting K.H.O., 161 N.J. at 347). The Legislature codified that standard in N.J.S.A. 30:4C-15.1(a). See D.C.A., 256 N.J. at 21 (recognizing the Legislature codified "the best[-]interests test" when it enacted N.J.S.A. 30:4C-15.1(a)).

Thus, when seeking termination of parental rights, the Division must establish, by clear and convincing evidence, the following four-prong criteria set forth in N.J.S.A. 30:4C-15.1(a), as amended by the Legislature in 2021:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

15

(4) Termination of parental rights will not do more harm than good.

See N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 612 (1986) (applying the clear-and-convincing standard in a parental-rights termination case). These four prongs "are not discrete and separate" but rather "overlap to offer a full picture of the child's best interests." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 554 (2014).

We give substantial deference to the trial court's opportunity to have observed the witnesses first-hand and to evaluate their credibility. Id. at 552. "Our general deference on appeal is also informed by the Family Part judge's 'feel of the case[,]'" N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 116 (App. Div. 2021) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)), and by the Family Part's "special expertise in matters related to the family[,]" F.M., 211 N.J. at 448. Accordingly, we defer to the trial court's factual findings "and uphold those findings if they are grounded in substantial and credible evidence in the record." D.C.A., 256 N.J. at 19. The trial court's decision should be reversed on appeal only if its findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)); see also N.J. Div. of Child

16

Prot. & Permanency v. D.A., 477 N.J. Super. 63, 80 (App. Div. 2023). We review the trial court's legal conclusions de novo. R.G., 217 N.J. at 552-53; see also D.C.A., 256 N.J. at 19 (acknowledging we give no deference to the trial court's interpretation of N.J.S.A. 30:4C-15.1(a)).

Guided by those principles, we consider defendants' challenges to the court's findings under each prong of the best-interests test.

"The first two prongs [of the best-interests test], N.J.S.A. 30:4C-15.1(a)(1) and (2), are 'the two components of the harm requirement' and 'are related to one another.'" N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 380 (App. Div. 2018) (quoting In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999)). "Therefore, 'evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child.'" Ibid. (quoting D.M.H., 161 N.J. at 379).

Under the first prong, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Dep't of Child. & Fams. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). The Division need not "wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" F.M., 211 N.J. at 449 (quoting D.M.H., 161 N.J. at 383).

Under prong two, "the inquiry centers on whether the parent is able to remove the danger facing the child." Id. at 451; see also D.C.A., 256 N.J. at 27 (finding prong two as amended was intended "to ensure that parental fitness -- not the child's bond with resource parents -- is the core inquiry when a judge considers the best[-]interests standard's second prong in a termination of parental rights case").

Prong three, N.J.S.A. 30:4C-15.1(a)(3), requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[,]" and the court to "consider[] alternatives to termination of parental rights." As to the first part of prong three, the reasonableness of the Division's efforts is not conditioned on their success. N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012). The success or failure of the Division's efforts will "not foreclose a finding that the Division met its statutory burden to try to reunify the children with the family." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007)). "Experience tells us that even [the Division]'s best efforts may not be sufficient to salvage a parental relationship." F.M., 211 N.J. at 452. As to the second part of the third prong, the Division must "prove by clear and convincing evidence that

'alternatives to termination of parental rights' have been appropriately considered." N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013) (quoting N.J.S.A. 30:4C-15.1(a)(3)).

Prong four, N.J.S.A. 30:4C-15.1(a)(4), "serves as a fail-safe against termination even where the remaining standards have been met." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007). "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." E.P., 196 N.J. at 108. In making that determination under the fourth prong, the court may consider evidence regarding the bond between the child and the resource parents. See D.C.A., 256 N.J. at 28 (holding the 2021 amendment to N.J.S.A. 30:4C-15.1(a) "precludes a court from considering the bond between a child and resource parents under the second prong of the best[-]interests standard but does not bar such evidence when the court addresses that standard's fourth prong").

As to prong one, the court found the Division had established John was endangered by his relationship with both defendants and would continue to be endangered by his relationship with them, "at least for the near future, mindful [Lisa] has made strides to improve." In rendering that finding, the court found

the testimony of both Drs. Gambone and Lee credible but gave "slightly more weight" to Dr. Gambone's testimony because he had been treating Lisa. Based on Dr. Gambone's testimony, the court could not conclude Lisa was "refus[ing] to treat her mental illness" by declining to take certain medication. The court, however, accepted Dr. Gambone's testimony that Lisa still was "not ready for reunification" and noted Dr. Gambone had given "no definitive period [of] time when [Lisa] could be safely reunified with her child." The court held the Division had established prong one as to Jack, finding he had "unstable housing, no employment, and substance abuse concerns" and had "failed to follow through on the recommendations" for treatment.

As to prong two, the court found the Division had established defendants were "unable to eliminate the harm facing the child or to provide a safe and stable home and that the delay of permanent placement w[ould] only add to the harm thus suffered." In rendering that finding, the court acknowledged Lisa's participation in services and Dr. Gambone's testimony that although Lisa's mental health had been improving, he still did not recommend she have custody of John "even at the late date in this litigation."

As to prong three, the court found the Division had established it had provided "defendants with appropriate services . . . and that alternatives to termination of parental rights ha[d] been considered."

As to prong four, the court held the Division had established termination of parental rights would not "do more harm than good." The court found that despite the "significant strides in improving her conditions," "[e]ven at this late date [Lisa] is still not ready for reunification" and had "merely reached the point of limited unsupervised visits."

The court's findings under each prong of the best-interests test as to each defendant were supported by substantial credible evidence in the record. Lisa's mental-health issues directly endangered John's safety, warranting his removal. Although she made some strides in addressing those issues, she remained unable to safely and independently parent and care for John. After nearly four years of services and treatment, no expert – including her treating psychologist – recommended reunification with John now or in the foreseeable future.

Like the trial court, we recognize the efforts Lisa has made. But "[w]e have made it clear that '[c]hildren must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement.'" L.J.D., 428 N.J. Super. at 483-84 (second alteration in

original) (quoting N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 210 (App. Div. 2007)). And that is exactly what Lisa and Dr. Gambone propose: an indefinite continuation of resource care. However, "'expeditious, permanent placement' is favored over 'protracted efforts for reunification[.]'" Id. at 484 (alteration in original) (quoting C.S., 367 N.J. Super. at 111). "Keeping the child in limbo, hoping for some long term unification plan, would be a misapplication of the law." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001)).

Lisa's reliance on New Jersey Division of Youth and Family Services v. F.M., 375 N.J. Super. 235 (App. Div. 2005), is misplaced. In that case, unlike here, the defendant's expert had opined the defendant "might be able to achieve reunification after six more months of therapy . . . ." Id. at 262. Dr. Gambone did not make a similar forecast about Lisa. The record established John remains at risk if placed in Lisa's care, a risk that no one opined would be ameliorated in the foreseeable future.

As the Division concedes, the court erred to the extent in deciding prong two it considered the harm John would suffer if his relationship with his resource parents was severed. In 2021, the Legislature amended N.J.S.A. 30:4C-15.1(a)(2) to eliminate a provision that enabled the Division to prove prong two

based on that type of harm. D.C.A., 256 N.J. at 27 (finding "[t]he Legislature thus amended N.J.S.A. 30:4C-15.1(a)(2) to ensure that parental fitness -- not the child's bond with resource parents -- is the core inquiry when a judge considers the best interests standard's second prong in a termination of parental rights case"). But that error was harmless given the other evidence supporting the court's finding. See R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . . "). The testimony of Drs. Gambone and Lee demonstrates Lisa remains unable to independently care for John at present or any time in the foreseeable future.

Lisa does not dispute the Division provided her, as the court found, "a myriad of services." She contends those services were not tailored to her needs. She specifically finds fault with the requirement she participate in multiple substance-abuse programs given the court's ultimate finding she did not have a substance-abuse issue. But that requirement was "not imposed arbitrarily." N.J. Div. of Child Prot. & Permanency v. J.C., 440 N.J. Super. 568, 580 (App. Div. 2015). When Lisa first met with Dr. Gambone in 2021, she reported a history of substance abuse, including alcohol, marijuana, and cocaine, beginning at age sixteen, but denied recent use. Lisa attended a substance-abuse evaluation but

refused to sign a release for the Division to receive the results. In January 2023, Lisa told a Division case worker "she had a past substance abuse problem but ha[d] been clean for a year." Lisa's assertion that services provided by the Division were unnecessary was not supported by any testimony from Dr. Gambone.

Lisa contends the Division did not provide her with recommended therapeutic visitation. In fact, she was provided with therapeutic visitation until the therapeutic-visitation provider discharged her from the program for missing five weeks of visitation when she had knee surgery. She later resumed therapeutic visitation in Florida in July 2024. Dr. Gambone did not indicate Lisa's inability to safely parent John was attributable to a lack of services provided by the Division.

Lisa faults the court for not imposing a permanency plan of kinship legal guardianship despite the resource parents' clear testimony that they wanted to adopt John. Lisa's assertion that a court can impose a kinship legal guardianship despite the wishes of the resource parents is unsupported by statute or case law. Moreover, the resource parents' thoughtful testimony explaining why they chose adoption and not a kinship legal guardianship supported the court's finding as to prong three.

A-2394-24

The court's findings regarding Jack were also supported by the evidence in the record. Dr. Lee's findings regarding Jack were unchallenged, including his testimony about having "significant concerns against [Jack] being an adequate independent caretaker for . . . [John], at the time or within the foreseeable future" and his conclusion "[Jack's] prognosis for significant and lasting changes [wa]s poor." Jack does not dispute his lack of involvement in the litigation or his limited compliance with court-ordered services but blames them on the Division. He faults the Division for failing to locate him sooner. However, the record demonstrates the Division made efforts to conduct a search for Jack pursuant to N.J.S.A. 30:4C-12. It also demonstrates Jack was aware John was in resource care but made no effort to participate in the litigation until May 2023. Jack's assertions regarding the Division's purported failure to provide him with reasonable services or a meaningful case plan are belied by the record. Contrary to Jack's contention, the court's decision to terminate Jack's parental rights was not based solely on his homelessness and unemployment. The court appropriately considered all of the evidence presented pursuant to the best-interests standard.

For all of these reasons, we affirm the March 20, 2025 order terminating defendants' parental rights.

A-2394-24

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2394-24